The STATE of Texas, Petitioner,

v.

K.E.W., Respondent.

No. 09–0236.

Supreme Court of Texas.

Argued Feb. 18, 2010.

Decided July 2, 2010.

Donald S. Glywasky, Barry C. Willey, Galveston County Legal Dept., Galveston, TX, for Petitioner.

Richard Hugh Branson, Attorney at Law, League City, TX, Thomas W. McQuage, Attorney at Law, Galveston, TX, for Respondent.

Beth Mitchell, Advocacy, Inc., Austin, TX, for amicus curiae Advocacy, Inc.

Justice JOHNSON delivered the opinion of the Court.

In this case we consider whether the evidence supporting a court order requiring a mentally ill person to undergo mental health services is legally sufficient. The trial court found that K.E.W. was mentally ill and as a result of that mental illness was likely to cause serious harm to others, and the court ordered him to submit to temporary inpatient mental health services. The court of appeals reversed. It held there was no evidence of a recent overt act tending to confirm that K.E.W. was likely to cause serious harm to others. We conclude the evidence is legally sufficient to support the trial court's order and reverse the court of appeals' judgment. We remand to the court of appeals for review of K.E.W.'s factual sufficiency issues.

## I. Background

On April 17, 2008, K.E.W., who had previously been diagnosed with schizophrenia and was a regular patient of the Gulf Coast Mental Health and Mental Retardation Center (Center), went to the Center for an appointment. While he was there he told his treating physician at the Center, Dr. Pugh, that he had been assigned to impregnate multiple women. K.E.W. would not cooperate with the staff. He paced around the building smoking cigarettes, stated that he wanted to impregnate some of the Center's female staff, and repeatedly asked for a particular female employee. The staff became concerned enough about his behavior that they isolated the female employee. Dr. Pugh called the police because he believed K.E.W. might be a danger to others. K.E.W. refused to cooperate with the police, and they took him to the emergency room at the University of Texas Medical Branch at Galveston. There, K.E.W. told the treating physicians that he had been chosen to help populate a new and better race of humans. He said there was a group of women he planned to find and impregnate, including his adult stepdaughter. He had written plans detailing his mission and papers with the names of several women whom he believed he needed to impregnate. He expressed his belief that some of the women he was seeking had been at or near the hospital when he was brought there, but they had departed by plane and time travel. He became agitated and angry and accused the hospital staff of withholding information about the women's whereabouts. He insisted that he needed to leave the hospital to accomplish his mission.

The State sought court orders to commit K.E.W. for temporary mental health services and to administer psychoactive medication. *See* TEX. HEALTH & SAFETY CODE § 574.034. Section 574.034 of the Texas Health and Safety Code is entitled "Order for Temporary Mental Health Services" and provides, in relevant part:

(a) The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:

(1) the proposed patient is mentally ill; and

(2) as a result of that mental illness the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; or

(C) is:

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

. . . .

(c) If the judge or jury finds that the proposed patient meets the commitment criteria prescribed by Subsection (a), the judge or jury must specify which criterion listed in Subsection (a)(2) forms the basis for the decision.

(d) To be clear and convincing under Subsection (a), the evidence must include expert testimony and, unless waived, evidence of a *recent overt act* or a continuing pattern of behavior *that tends to confirm:*

(1) the likelihood of serious harm to the proposed patient or others; or

(2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.

*Id.* § 574.034 (emphasis added).

At the non-jury hearing on its commitment motion, the State presented K.E.W.'s medical records, testimony from two Center employees, and testimony from two doctors who examined him at the hospital. K.E.W. presented no evidence.

The trial court committed K.E.W. to Austin State Hospital for inpatient care not to exceed ninety days. The court found by clear and convincing evidence that K.E.W. was mentally ill and as a result of that mental illness he (1) was likely to cause serious harm to others and (2) was suffering severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether to submit to treatment. *See* 276 S.W.3d 686, 691–92.

Immediately following the commitment hearing, the trial court heard and granted the State's application for an order to administer psychoactive medication. The trial court based its order on findings that K.E.W.'s mental illness rendered him incapable of making medical treatment decisions and that such treatments would be in K.E.W.'s best interest.

K.E.W. appealed. The court of appeals determined that the evidence was legally sufficient to support the trial court's finding that K.E.W. was mentally ill but reversed the order for mental health services. *Id.* at 699–700. It held there was no evidence of an overt act or continuing pattern of behavior that tended to confirm either deterioration of K.E.W.'s ability to function independently, *id.* at 697, or that he was likely to cause serious harm to others. *Id.* at 699; *see* TEX. HEALTH & SAFETY CODE § 573.034(d). Because the order authorizing the administration of psychoactive medications depended on the existence of a valid order for mental health services, the court of appeals also reversed the order to administer psychoactive medication. 276 S.W.3d at 700.

We granted the State's petition for review.

The State urges that the evidence was legally sufficient to support the trial court's findings and orders. Specifically, it argues that (1) the court of appeals erred by applying an elevated standard of evidentiary review; (2) the evidence was legally sufficient to support the trial court's finding that K.E.W. committed an overt act that tended to confirm the likelihood he would cause serious harm to others; and (3) because the evidence was legally sufficient to support the commitment order, both the trial court's commitment order and its order that K.E.W. be administered psychoactive medication should be affirmed.

K.E.W. does not challenge the finding that he is mentally ill. He urges us to affirm the court of appeals' decision as to the standard of review and the legal insufficiency of the evidence. K.E.W. agrees that disposition of the commitment order controls disposition of the order to administer psychoactive medications.

## II. Discussion

### A. Jurisdiction

The ninety-day period for which K.E.W. was ordered to receive services has expired. Nevertheless, we have jurisdiction. The expiration of the time for which he was ordered to receive services does not require the appeal to be dismissed for mootness. *State v. Lodge*, 608 S.W.2d 910, 912 (Tex.1980).

### B. Standard of Review

The State argues that Section 574.034's clear and convincing evidence requirement does not alter the appropriate standard of review. It urges that the evidence was legally sufficient so long as there was more than a scintilla of evidence to support the trial court's challenged finding. We disagree.

Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979) (per curiam). Evidence that merely exceeds a scintilla is not legally sufficient when the burden of proof is clear and convincing. *See In re J.F.C.*, 96 S.W.3d 256, 264–65 (Tex.2002); *see also Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex.2004). In evaluating evidence for legal sufficiency under a clear and convincing standard, we review all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See In re J.F.C.*, 96 S.W.3d at 266. We resolve disputed fact questions in favor of the finding if a reasonable factfinder could have done so, and we disregard all contrary evidence unless a reasonable factfinder could not have done so. *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex.2005); *In re J.F.C.*, 96 S.W.3d at 266.

### C. Order for Temporary Civil Commitment

#### 1. Proof required

In regard to the issue urged by the State, the trial court, to commit K.E.W., was required to find by clear and convincing evidence that as a result of his mental illness, K.E.W. was likely to cause serious harm to others. TEX. HEALTH & SAFETY CODE § 574.034(a)(2)(B). The statute does not prescribe what evidence the State must present to carry its burden, except that it must include expert testimony and evidence of a recent overt act that "tends to confirm the likelihood of serious harm to . . . others." *Id.* § 574.034(d)(1). The court of appeals interpreted the latter as requiring evidence of "a substantial

threat of harm, based on actual dangerous behavior, manifested by some overt act or threats in the past." 276 S.W.3d at 695. The court further stated that evidence of "possible" or "potential" harm to others does not satisfy the State's burden. *Id.* at 694. Arranging previous court of appeals' cases into three categories—those involving "Per Se Overt Acts of Dangerousness,"[1] those involving "Ambiguous Conduct,"[2] and those involving "No Substantially Dangerous Conduct"[3]—K.E.W. urges the court of appeals' judgment be affirmed on the basis that courts of appeals have consistently required an "overt act" be proven by evidence of actual harmful conduct demonstrating a threat of imminent harm to others. The State, on the other hand, urges that the statute does not require evidence of an act that either is actually harmful itself or that demonstrates harm to others is imminent. We agree with the State.

 In construing statutes, our primary objective is to give effect to the Legislature's intent as expressed in the statute's language. *Galbraith Eng'g Consultants, Inc. v. Pochucha,* 290 S.W.3d 863,

867 (Tex.2009). We rely on the plain meaning of the text unless a different meaning is supplied by legislative definition, is apparent from the context, or unless such a construction leads to absurd results. *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625–26 (Tex.2008). Language in a statute is presumed to have been selected and used with care, and every word or phrase in a statute is presumed to have been intentionally used with a meaning and purpose. *See In re Caballero,* 272 S.W.3d 595, 599 (Tex.2008); *Chastain v. Koonce,* 700 S.W.2d 579, 582 (Tex.1985).

First, we address the "overt act" requirement. The phrase is not defined in the Health and Safety Code. Accordingly, we read it in context and construe the term according to common usage. *See* TEX. GOV'T CODE § 311.011(a). When something is "overt," it is generally considered to be open and observable, rather than concealed or secret. *See* BLACK'S LAW DICTIONARY 1137 (8th ed. 2004); WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1386 (1996). And an "act" is something that is done or performed. *See* BLACK'S at

1. *State ex rel. E.E.,* 224 S.W.3d 791 (Tex.App.-Texarkana 2007, no pet.); *State ex rel. D.C.,* No. 12–05–00138–CV, 2005 WL 3725079 (Tex.App.-Tyler Jan. 31, 2006, no pet.); *D.M. v. State,* 181 S.W.3d 903 (Tex.App.-Dallas 2006, no pet.); *In re K.S.,* No. 2–03–295–CV, 2004 WL 254267 (Tex.App.-Fort Worth Feb. 12, 2004, no pet.); *In re S.E.W.,* Nos. 14–02–00602–CV, 14–02–00603–CV, 2002 WL 31599910 (Tex.App.-Houston [14th Dist.] Nov. 21, 2002, no pet.); *Goldwait v. State,* 961 S.W.2d 432 (Tex.App.-Houston [1st Dist.] 1997, no writ); *L.S. v. State,* 867 S.W.2d 838 (Tex.App.-Austin 1993, no writ); *K.L.M. v. State,* 735 S.W.2d 324 (Tex.App.-Fort Worth 1987, no writ); *W.L. v. State,* 698 S.W.2d 782 (Tex.App.-Fort Worth 1985, no writ).

2. *In re Protection of J.J.K. v. State,* Nos. 14–03–00379–CV, 14–03–00380–CV, 2003 WL 22996950 (Tex.App.-Houston [14th Dist.] Dec. 23, 2003, no pet.); *G.H. v. State,* 96 S.W.3d

629 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *In re State for Interest of P.W.,* 801 S.W.2d 1 (Tex.App.-Fort Worth 1990, writ denied).

3. *State ex rel. L.H.,* 183 S.W.3d 905 (Tex.App.-Texarkana 2006, no pet.); *M.S. v. State,* 137 S.W.3d 131 (Tex.App.-Houston [1st Dist.] 2004, no pet.); *In re State ex rel. K.D.C.,* 78 S.W.3d 543 (Tex.App.-Amarillo 2002, no pet.); *K.T. v. State,* 68 S.W.3d 887 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *D.J. v. State,* 59 S.W.3d 352 (Tex.App.-Dallas 2001, no pet.); *In re Interest and Protection of C.O.,* 65 S.W.3d 175 (Tex.App.-Tyler 2001, no pet.); *T.G. v. State,* 7 S.W.3d 248 (Tex.App.-Dallas 1999, no pet.); *Johnstone v. State,* 961 S.W.2d 385 (Tex.App.-Houston [1st Dist.] 1997, no writ); *Broussard v. State,* 827 S.W.2d 619 (Tex.App.-Corpus Christi 1992, no writ); *In re J.S.C.,* 812 S.W.2d 92 (Tex.App.-San Antonio 1991, no writ).

26; WEBSTER'S at 19. Although this Court has not construed the term in the civil commitment context, courts from other jurisdictions have said it can include both physical acts and verbal statements. *See, e.g., In re Mental Health of E.M.*, 265 Mont. 211, 875 P.2d 355, 356–57 (1994) (holding that a verbal statement of a threatening nature can constitute an overt act within the context of civil commitment cases). We do not see any indication the Legislature intended to limit the term "overt act" to physical conduct as opposed to any other action objectively perceptible, including verbal statements. Words can express intent just as physical actions can. For example, a person saying he is going to hit someone can reflect intent to do so, just as the physical act of making a fist and drawing back can reflect such intent. We conclude that a proposed patient's words are overt acts within the meaning of Section 574.034(d). Further, when the words expressed by a person that has a mental illness foreshadow violence, the Legislature has permitted the law's intervention to prevent serious injury to others. Stated another way, statements made by a proposed patient such as K.E.W. can be relevant both to determining whether he is mentally ill and also to predicting what actions he might or will take in the future as a result of his mental illness. The court of appeals stated that "potential" harm is not sufficient to deprive a person of his liberty and the threat of harm must be substantial. 276 S.W.3d at 694–95 (citing

*J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App.-Houston [1st Dist.] 2005, no pet.); *State ex rel. L.C.F.*, 96 S.W.3d 651, 657 (Tex.App.-El Paso 2003, no pet.); *In re Interest and Protection of C.O.*, 65 S.W.3d 175, 181–82 (Tex.App.-Tyler 2001, no pet.); *Broussard v. State*, 827 S.W.2d 619, 622 (Tex.App.-Corpus Christi 1992, no writ) (stating that "[b]are psychiatric expert opinion of a 'potential danger' to others is insufficient to support a commitment")). Echoing that statement, K.E.W. argues that evidence of an overt act within the meaning of the statute must show a clear and present danger of imminent harm to others. He urges that to the extent his words can be considered evidence, the requirement that they show imminent harm to others accords with the United States Supreme Court's holdings that speech is "protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello v. City of Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *see also Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). K.E.W.'s argument misses the mark.

The statute does not require that the overt act demonstrate serious harm to others is imminent if the proposed patient is not committed; its language is broad enough to permit commitment even if the person's oral threat does not cause physical harm.[4] TEX. HEALTH & SAFETY CODE

---

4. The requirements as to danger to others posed by the proposed patient varies widely in other jurisdictions, with some jurisdictions requiring the danger to others to be imminent while others require the risk to be a substantial risk, a clear and present threat, likely, or a reasonable expectation. *See, e.g.,* ARIZ.REV. STAT. § 36–501 (can reasonably be expected to result in serious physical harm); HAW.REV. STAT. § 334–60.2 (imminently dangerous); IOWA CODE § 229.1(17) (is likely to physically injure the person's self or others); LA.REV. STAT. § 28:2(3) (reasonable expectation of substantial risk of physical harm); MICH. COMP. LAWS § 330.1401(a) (can reasonably be expected within near future to cause serious injury); MINN.STAT § 253B.02 Subd. 17(2) (presents a clear danger); MONT.CODE § 53–21–102(7) (injury or imminent threat thereof); N.M. STAT § 43–1–3(N) ("more likely than not that in the near future" person will cause harm).

§ 574.034. Rather, the statute requires evidence of an overt act that "tends to confirm" the "likelihood" of serious harm to others. *Id.* § 574.034(d). In determining the meaning of the statutory language, we presume its words were selected with care and used with purpose. *See In re Caballero,* 272 S.W.3d at 599. "Likelihood" connotes more than mere possibility or conjecture and is synonymous with "probability." WEBSTER's at 1114; *see Fibreboard Corp. v. Pool,* 813 S.W.2d 658, 681 (Tex.App.-Texarkana 1991, writ denied).

Some appellate courts, including the court of appeals in this case, have held that the proposed patient must have engaged in "actual dangerous behavior" manifested by an overt act or threats. *See, e.g.,* 276 S.W.3d at 695 (citing *J.M.,* 178 S.W.3d at 196; *Taylor v. State,* 671 S.W.2d 535, 538 (Tex.App.-Houston [1st Dist.] 1983, no writ)). This proposition seems to have originated with the court of appeals' analysis in *Moss v. State,* 539 S.W.2d 936, 948–51 (Tex.Civ.App.-Dallas 1976, no writ). In *Moss,* physicians testified that their diagnoses were based on statements the proposed patient made to them, but they did not reveal the contents of those statements or explain why they believed she was dangerous. *Id.* The *Moss* court stated that an order for involuntary commitment must be supported by the recommendation of a physician and proof of the factual information on which the recommendation was based. *Id.* at 950. We do not read *Moss* as requiring proof of a substantial threat of future harm founded on actual, dangerous behavior. In any event, after *Moss* was decided, the Legislature specified both the criteria by which a person can be ordered to submit to mental health services and certain elements of evidence required by the clear and convincing evidentiary standard in such proceedings. Act of April 20, 1983, 68th Leg., R.S., ch. 47,

§ 50, 1983 Tex. Gen. Laws 211, 241 (current version recodified at TEX. HEALTH & SAFETY CODE § 574.034); *see also* HOUSE STUDY GROUP, BILL ANALYSIS, C.S. S.B. 435, 68th Leg., R.S., 4 (1983). The statute applicable to this case does not require evidence of a recent overt act that by itself proves the likelihood a proposed patient will cause serious harm to others. *See* TEX. HEALTH & SAFETY CODE § 574.034(d). It requires only that the overt act "tends to confirm" the likelihood of serious harm. *Id.* "Tends" means "to have leaning," "to contribute to," or "have a more or less direct bearing or effect." *See* BLACK'S LAW DICTIONARY 1507 (8th ed. 2004) (defining "tend" as to be disposed toward something; to serve, contribute, or conduce in some degree or way; to have more or less a direct bearing or effect; and to be directed or have a tendency to an end, object, or purpose); WEBSTER's at 1955 (defining "tend" as "to be disposed or inclined in action, operation, or effect to do something"); *see also Simmons v. State,* 282 S.W.3d 504, 508 (Tex.Crim.App.2009) (stating that in determining whether non-accomplice evidence tends to connect a defendant to the offense, "the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense" (quoting *Malone v. State,* 253 S.W.3d 253, 257 (Tex.Crim. App.2008))); *Nash v. State,* 61 Tex.Crim. 259, 134 S.W. 709, 717–21 (Tex.Crim.App. 1911) (defining the word "tend" as "[t]o stretch, extend, direct one's course; to be directed as to any end, object or purpose; to aim; to have or give a leaning" and stating that "if the circumstances lead toward, or tend toward, the defendant as the party who committed the offense, and show the truth of the prosecutrix, this would be all the law required"). Accord-

ingly, a recent overt act by a proposed patient "tends to confirm" that the patient poses a likelihood of serious harm to others within the meaning of Section 573.034(d) if the overt act is to some degree probative of a finding that serious harm is probable, even though the overt act itself may not be dangerous. Such a construction honors the statute's language and the Legislature's attempt to fairly balance the rights of a proposed patient, the difficulties in predicting future behavior of mentally ill persons, and the community's interest in protection from persons who are mentally ill and who, by reason of their illness, may commit future harmful acts against others. *See Addington v. Texas*, 441 U.S. 418, 426–30, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

In sum, the statute requires evidence of a recent act by the proposed patient, either physical or verbal, that can be objectively perceived and that is to some degree probative of a finding that serious harm to others is probable if the person is not treated. The overt act itself need not be of such character that it alone would support a finding of probable serious harm to others. *See* TEX. HEALTH & SAFETY CODE § 573.034(d)(1).

Keeping the foregoing in mind, we next review the evidence presented at the commitment hearing.

## 2. The Commitment Hearing

An employee of the Gulf Coast Center testified that he was present when K.E.W. came to the Center on April 17, 2008. According to the employee, K.E.W. appeared to be extremely paranoid, was difficult to redirect, and asked numerous times for a certain female staff member who worked there. The staff became concerned enough to place the female staff member "in the back behind a closed door" until K.E.W. could be escorted from the Center. The employee further testified that K.E.W. refused to cooperate with the staff, paced around the building, and refused to calm down or stand still. As a result of K.E.W.'s behavior the police were called, but when they arrived, he still refused to cooperate.

A counselor from the Center testified that according to the medical records, K.E.W. said "he wanted to get some Gulf Coast Center women pregnant." She testified that he was a regular patient of the Center—"[h]e is on our Ag team, the highest level of services you will see"—and that the Center employees recommended he be committed to Austin State Hospital.

Dr. Ortiz, one of K.E.W.'s treating psychiatrists at the hospital, testified that she had seen K.E.W. daily during the week preceding the hearing and that during his stay at the hospital he would become agitated regarding his belief about the women. When he was in the emergency room he was inconsolable because he "experienced" the knowledge that some of the women that he was seeking were in the emergency room, that he had just missed them, and that staff members in the emergency room were withholding information from him about the women's whereabouts as a conspiracy to hide them from him. During the times Dr. Ortiz interacted with K.E.W., he became agitated, was intrusive, and "invaded [her] space." There were additional times when K.E.W. became very upset because he believed Dr. Ortiz knew where the women were located.

Dr. Ortiz expressed concern about two particular behaviors of K.E.W. as a potential danger to others. One of the potential dangers was non-consensual sexual interaction with the specific women he sought. While Dr. Ortiz acknowledged K.E.W. did not state that he intended to impregnate anyone against her will and to her knowl-

edge K.E.W. did not directly proposition a particular staff member or patient at the hospital, she explained that K.E.W. was very intrusive and she did not know, given his state of mind, if he would understand that "no" means "no."

Dr. Stone, another of K.E.W.'s treating psychiatrists at the hospital, evaluated K.E.W. and stated that K.E.W. had been diagnosed with schizophrenia. K.E.W. told Dr. Stone on several occasions that he was on a mission to create a superior race, which involved tracking down and impregnating certain women. Dr. Stone stated that K.E.W. carried papers with him that detailed his intent to carry out his plans and that "there are several names that he has that he claims are the names of the women that he wishes to impregnate." Dr. Stone testified that K.E.W. did not exhibit any threatening behavior at the hospital, but that because of K.E.W.'s firm belief in his delusion that he needed to locate and impregnate certain women, he could harm others. He opined that K.E.W. was a danger to this group of women and expressed concern that K.E.W. would act on his delusions if he found a female who he believed was promised to him. Dr. Stone also testified that K.E.W. is a danger to women in general because K.E.W. might mistake any woman for one of the women he believed was promised to him. He testified, "In fact on the unit we're very careful when female medical staff go to talk to him to keep the door open. Not because he is homicidal, but in his confused belief he could believe a woman is there and someone promised to him that does want to be impregnated."

Dr. Stone recommended that K.E.W. receive antipsychotic medication and treatment at Austin State Hospital.

### 3. Legal Sufficiency of the Evidence

██ The record demonstrates that after K.E.W. arrived for his appointment at the Gulf Coast Center, he stated that he wanted to "get some Gulf Coast Center women pregnant" and that he had an assignment to impregnate multiple women; vehemently insisted on contacting a certain female Center staff member; and interfered with female staff despite being directed otherwise.

After he was taken to the hospital, K.E.W. said on several occasions that there were women he needed to track down and impregnate. He had written plans detailing his mission and had several names of women he was searching for. His treating physicians at the hospital testified that he would become very agitated, intrusive, and angry regarding his beliefs, accused the hospital staff of conspiring against him and withholding information about the women's whereabouts, and insisted that he needed to leave the hospital to accomplish his mission.

In holding that the evidence failed to establish a recent overt act that tended to confirm K.E.W. was likely to cause serious harm to others, the court of appeals relied heavily on (1) the fact that the record did not contain the statement K.E.W. made to the female staff member at the Gulf Coast Center who was then isolated by the Center staff or the specific actions taken by K.E.W. that made it necessary to protect her and (2) Dr. Ortiz's testimony that K.E.W. had not made any sexual advances toward women at the hospital nor had he said that he would impregnate women against their will. 276 S.W.3d at 698–99. However, evidence is not legally insufficient because a fact might have been established by other or more evidence. In evaluating evidence for legal sufficiency, regardless of whether the burden of proof is by a preponderance of the evidence or by clear and convincing proof, all the evidence is reviewed in the light most favor-

able to the finding. *See In re J.F.C.*, 96 S.W.3d at 266. Disputed facts are resolved in favor of the finding if a reasonable factfinder could have done so, and all contrary evidence is disregarded unless a reasonable factfinder could not have done so. *City of Keller*, 168 S.W.3d at 817; *In re J.F.C.*, 96 S.W.3d at 266.

We agree with the court of appeals that evidence of a proposed patient's mental illness, without more, does not fulfill the statutory requirement for ordering involuntary inpatient mental health services. But K.E.W.'s statements fall within the kinds of overt conduct the statute's language makes clear the Legislature considered relevant to a commitment determination. Thus, K.E.W.'s statements regarding his belief that he had an assignment to impregnate specific women, his statements seeking access to the Center's female worker, the fact that he had written plans detailing his mission and had the names of specific women who he firmly believed he needed to impregnate, and his verbal insistence on searching for the women were all overt acts within the meaning of Section 574.034(d). And the trial court was required to consider those acts in light of his particular mental illness because the statute required a finding that he was mentally ill and that *as a result of that mental illness*, he was likely to cause serious harm to others. *See* Tex. Health & Safety Code § 574.034(a)(2).

To the extent the concurrence says that statements made by proposed patients must be evaluated in light of the particular words of the statement and the facts of each case, we agree. But we disagree with the proposition that a verbal statement alone cannot suffice as an overt act under the statute. The concurrence agrees only that K.E.W.'s conduct in writing down and carrying with him plans to complete his mission and the names of women he was assigned to impregnate constitutes an "overt act ... that tends to confirm ... the likelihood of serious harm to the proposed patient or others." *See* Tex. Health & Safety Code § 574.034(d). We, however, believe that his verbal expression of the plan was sufficient under the circumstances to amount to an overt act within the meaning of the statute. Further, we conclude that when his statements and the other evidence are viewed in the light most favorable to the trial court's findings, as they must be, *see In re J.F.C.*, 96 S.W.3d at 266, there is legally sufficient evidence to support the findings. That is, there is legally sufficient evidence on which a reasonable trier of fact could have formed a firm belief or conviction that as a result of his mental illness, K.E.W. would likely cause serious harm to others and that recent objectively observable acts by K.E.W. tended to confirm such a finding. *See id.* § 574.034(d). We sustain the State's first issue.

### D. Order to Administer Psychoactive Medication

After issuing the commitment order, the trial court held a hearing on and granted the State's order to administer psychoactive medication. The court was authorized to order administration of psychoactive medication only if K.E.W. was under a valid order for temporary or involuntary mental health services. *See id.* § 574.106(a)(1). K.E.W. agrees that the disposition of the commitment order controls the order to administer psychoactive medications. Because we have determined that the court of appeals erred in reversing the trial court's order committing K.E.W. for temporary involuntary mental health services, we also conclude that the court of appeals erred in reversing the trial court's order that K.E.W. be administered psychoactive medication.

### III.   Conclusion

The evidence is legally sufficient to support the trial court's order that K.E.W. be required to undergo temporary inpatient mental health services.   We reverse the court of appeals' judgment and remand the case to that court for it to consider K.E.W.'s factual sufficiency complaints and for further proceedings.

Justice GREEN filed a concurring opinion, in which Justice WILLETT joined.

Justice LEHRMANN did not participate in the decision.

Justice GREEN, joined by Justice WILLETT, concurring.

I concur with the Court's judgment in this case, and in nearly all of its analysis. I write separately to pause, however, on the notion that a verbal statement, by itself, may be an "overt act ... that tends to confirm ... the likelihood of serious harm to the proposed patient or others," TEX. HEALTH & SAFETY CODE § 574.034(d). Certainly some verbal statements—verbal threats—may constitute such overt acts, as the Montana Supreme Court held in a case the Court cites. *See In re Mental Health of E.M.*, 265 Mont. 211, 875 P.2d 355, 356–57 (1994).   Indeed, what the United States Supreme Court has called "true threats" are treated uniquely even in the First Amendment context, where other liberties are at stake:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.   The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats

protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur.   Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Virginia v. Black,* 538 U.S. 343, 359–60, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (quotations and citations omitted).   By contrast, as the Court states here, "Dr. Ortiz acknowledged K.E.W. did not state that he intended to impregnate anyone against her will and to her knowledge K.E.W. did not directly proposition a particular staff member or patient at the hospital."   315 S.W.3d at 24–25.   Some of K.E.W.'s verbal statements in this case may not, by themselves, rise to the level of a verbal threat in my view, at least in the sense described by Black.   For instance, "K.E.W.'s statement[ ] regarding his belief that he had an assignment to impregnate specific women" may not rise to the level of a threat if one considers it purely in the abstract.   *See id.* at 26.   Therefore, I would leave it as an open question in this case whether any of K.E.W.'s statements, by themselves, constitute an "overt act ... that tends to confirm ... the likelihood of serious harm to the proposed patient or others" for purposes of sanctioning "court-ordered temporary inpatient mental health services" under section 574.034.[1]

In this case, I would not address this more difficult question as the Court does by indicating that some of K.E.W.'s verbal statements were "evidence on which a reasonable trier of fact could have formed a

---

1. Moreover, the same standard applies to "court-ordered *extended* inpatient mental

health services."   *See* TEX HEALTH & SAFETY CODE § 574.035(e) (emphasis added).

firm belief or conviction that ... recent objectively observable acts by K.E.W. tended to confirm" a finding that "as a result of his mental illness, K.E.W. would likely cause serious harm to others." In my view, the facts that K.E.W. "had written plans detailing his mission and papers with the names of several women whom he believed he needed to impregnate" and "carried [these] papers with him" meet the overt act requirement. *See id.* at 18, 25. It is an overt act to write a list of women's names as well as detailed plans to impregnate them (among other things), or to carry these documents on one's person and hold them out to those providing one's medical treatment, as K.E.W. did. Because these were overt acts that tend to confirm the likelihood of danger to others, I agree with the result in this case. My concern is only that in another case, where a verbal statement that does not rise to the level of a verbal threat is the only evidence, a person may be civilly committed for mental health treatment beyond the Legislature's certain intent.