

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00375-CV

| | | |
|---|---|---|
| In the Matter of P.R.G. | § | From County Court at Law No. 1 |
| | § | of Wichita County (37221-LR-D) |
| | § | November 8, 2012 |
| | § | Opinion by Justice McCoy |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was error in the trial court's order. We modify the order of the trial court to remove the language "the patient presents a danger to the patient or others in the inpatient facility in which the patient is being treated as a result of a mental disorder or mental defect as determined under Section 574.1065, Texas Health and Safety Code." It is ordered that the order of the trial court is affirmed as modified.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Bob McCoy



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-12-00375-CV**

IN THE MATTER OF P.R.G.

------------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In two issues in this accelerated appeal, Appellant P.R.G. appeals the trial court's order authorizing psychoactive medication under health and safety code section 574.106.  *See* Tex. Health & Safety Code Ann. §§ 574.070, 574.106, 574.108 (West 2010).  We affirm as modified.

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

In June 2012, the 15th District Court of Grayson County issued an order in P.R.G.'s criminal assault case to confine her for a period not to exceed 120 days "for the purpose of further examination and treatment toward the specific objective of attaining competency to stand trial."

In August 2012, Dr. Denis Atkinson, P.R.G.'s doctor at the Wichita Falls campus of the North Texas State Hospital, applied for an order to administer the psychoactive medication Haloperidol (Haldol). After a hearing on the application, the trial court signed the order to authorize psychoactive medication, specifically antipsychotic medication, finding by clear and convincing evidence, per health and safety code section 574.106(a-1), that

the patient is in need of psychoactive medication:

AND

> the patient is in custody awaiting trial in a criminal proceeding and was ordered to receive inpatient mental health services in the six months preceding a hearing under this section

AND

> the patient lacks the capacity to make a decision regarding the administration of the proposed medication and treatment with the proposed medication is in the best interest of the patient.

> the patient was ordered to receive inpatient mental health services by a criminal court with jurisdiction over the patient and the patient presents a danger to the patient or others in the inpatient facility in which the patient is being treated as a

3

result of a mental disorder or mental defect as determined under Section 574.1065, Texas Health and Safety Code, and treatment with the proposed medication is in the best interest of the patient[.]

This appeal followed.

### III.  Sufficiency of the Evidence

P.R.G. complains that the evidence is legally and factually insufficient to support the trial court's findings under section 574.106(a-1).

### A.  Standards of Review

The State's burden of proof under health and safety code section 574.106 is clear and convincing evidence.  Tex. Health & Safety Code Ann. § 574.106(a-1).  Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.  *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010).

In evaluating evidence for legal sufficiency under the clear and convincing standard, we review all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true.  *Id*.  We resolve disputed fact questions in favor of the finding if a reasonable factfinder could have done so, and we disregard all contrary evidence unless a reasonable factfinder could not have done so.  *Id.*  The factfinder, not this court, is the sole judge of the credibility and demeanor of the witnesses.  *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

4

In reviewing the evidence for factual sufficiency under the clear and convincing standard, we must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that its finding was true. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *Id.* We must not supplant the trial court's judgment with our own. *Id.* at 109. The factfinder is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id*.

## B. Health and Safety Code Section 574.106(a-1)

The trial court may issue an order authorizing psychoactive medication only if it finds that one of the two grounds in section 574.106(a-1) has been established by clear and convincing evidence after a hearing. Tex. Health & Safety Code Ann. § 574.106(a-1). The first ground that supports such an order is that the patient lacks the capacity to make a decision regarding the administration of the proposed medication and that treatment with the proposed medication is in the patient's best interest. *Id*. § 574.106(a-1)(1). The pertinent part of the second ground is a determination that the patient was ordered to receive inpatient mental health services by a criminal court with jurisdiction over the patient, that treatment with the proposed medication is in the best interest of the patient, and that the patient presents a danger to the patient or others in the

5

inpatient mental health facility in which the patient is being treated as a result of a mental disorder or mental defect as determined under section 574.1065. *Id.* § 574.106(a-1)(2)(A).

## 1. Dr. Atkinson's Application

We have set out below the information contained in Dr. Atkinson's application for an order to administer psychoactive medication, even though the trial court is not authorized to base its findings solely on a physician's application, to provide context for Dr. Atkinson's and P.R.G.'s testimonies at the hearing on the application. *See Moore v. State*, No. 07-10-00507-CV, 2011 WL 3587439, at *2 (Tex. App.—Amarillo Aug. 16, 2011, no pet.) (mem. op.) (citing *State ex rel. E.G.*, 249 S.W.3d 728, 731 (Tex. App.—Tyler 2008, no pet.). The trial court could not base its findings solely on the application because there must be evidence of the factual basis of an expert opinion to satisfy the clear and convincing burden of proof. *Id*. (citing *E.G.*, 249 S.W.3d at 732).

In his sworn application, Dr. Atkinson stated that antipsychotic psychoactive medication is the proper and customary course of treatment for and in the best interest of P.R.G. but that P.R.G. had verbally refused to take the medication voluntarily. As the basis for his conclusion that P.R.G. lacked the capacity to make a decision regarding administration of psychoactive medication, Dr. Atkinson stated, "The patient is actively delusional, lacks insight into her illness[,] and is unable to attend to reality. She has a diminished capacity to understand or adhere to a treatment plan. Currently she is not capable of acting

6

in her own behalf. She lacks competency." He stated that P.R.G.'s prognosis was fair with psychoactive medication treatment but that if left untreated, "the risk of self-harm and or aggression is significantly increased. Untreated[,] she is at high risk to further deteriorate."

Dr. Atkinson averred that he had considered medical alternatives to psychoactive treatment and less intrusive treatments likely to secure P.R.G.'s agreement to take the psychoactive medication but had determined that the medical alternatives would not be as effective. He also stated that he believed that the benefits of the psychoactive medication outweighed the risks of such medication in relation to P.R.G.'s present medical treatment and her best interest. He alternatively requested that, if the trial court found that P.R.G. had the capacity to make a decision regarding the administration of psychoactive medication, that the trial court order it on the basis that unless medicated, P.R.G. "presents a danger to self or others in the mental health facility in which [she] is being treated, as set forth in Texas Health & Safety Code § 574.1065, and treatment with the proposed medication is in [P.R.G.'s] best interest."

## 2. Dr. Atkinson's Testimony

At the hearing on his application, Dr. Atkinson stated that P.R.G. was being treated for schizophrenia and had "symptoms of both a schizoaffective with bipolar paranoid features." He described the defining characteristics of P.R.G.'s illness as follows:

She has a cognitive disturbance. Her thinking is—has a number of secondary psychotic phenomena. All that means is that she has an active delusional system. She lacks insight into the nature of her illness. She is exhibiting signs of paranoia. . . . She has also prior history of mania diagnosed, and when she was seen at the time of her interview at SB II by the treatment team, she appeared to be in a hypomanic phase.

Dr. Atkinson said that the medication most likely to be helpful to P.R.G. would be an antipsychotic medication like Haldol.

Dr. Atkinson testified that P.R.G. had refused to take the medication voluntarily. If medicated, he said that he would expect that some of her agitation would decrease and that she would stop "experiencing unseen voices talking to her." He noted that P.R.G. had been very polite and compliant at times but that she had also had some outbursts, "particularly one episode at night where she was very loud and very verbally abusive." He expressed concern that without medication, P.R.G. could experience further deterioration of her condition "at which time she might become dangerous to herself or others" and not become competent. Dr. Atkinson said that there were no alternatives that were likely to produce the same results as the court-ordered medication, that there were no less intrusive treatments likely to secure P.R.G.'s agreement to take the psychoactive medication, and that therapy classes alone would not be sufficient to restore her competency.

Dr. Atkinson assumed that another doctor had explained the medications and their benefits and side effects to P.R.G. when she was admitted to the state

8

hospital.[2]  Dr. Atkinson described the side effects of the proposed medication as ranging from tremors, shakes, muscle stiffness, and drooling to dyskinesias and oculogyria.[3]  He said that extensive use of the medication would result in "Parkinsonian-like syndrome," which he said can be corrected, and that the worst possible outcome "could be something like a tardive dyskinesia, which would be a permanent type of movement disorder involving the face."  Dr. Atkinson said that some of the side effects could be corrected with other medication.

Dr. Atkinson stated that he did not know if P.R.G. understood the risks and benefits of the medication because "[s]he does not feel she's ill," but he believed that the medication's benefits outweighed the potential side effects, that taking the medication was in P.R.G.'s best interest, that treatment with medication would improve P.R.G.'s quality of life, and that taking the medication would restore P.R.G. to competency.

---

[2]On cross-examination, Dr. Atkinson testified that Dr. Fadow had made the following statement in one of his psychiatric evaluations of P.R.G.: "I did offer to start her back on medications that she's taken in the past, including both Abilify and Seroquel, but she declined to take either medications.  I did offer her alternatives such as Risperdal, and she declined this as well."  Dr. Atkinson said that he based his assumption that Dr. Fadow had fully informed P.R.G. of the risks and benefits of antipsychotic medications on these statements.

[3]Dr. Atkinson described dyskinesias as muscle contractions and distortions and oculogyria as "[h]er eyes would turn up, and that would be very frightening and upsetting."

During cross-examination, Dr. Atkinson recounted P.R.G.'s past history with regard to treatment, stating that prior to her 2008 admission, P.R.G. had discontinued taking her medications,

> [a]nd as a result, there came about some domestic issues, violence and such. And I believe that just prior to her being put into the Grayson County jail, she'd had a family disturbance in which she was again aggressive and violent, and she had not been compliant with taking her medication.

Dr. Atkinson acknowledged that P.R.G. was attending competency classes and had always been compliant, agreeable, and cooperative in attending the classes and in her rapport with some of the staff on the ward.

### 3. P.R.G.'s Testimony

P.R.G. testified that she had used Seroquel, Risperdal, Zoloft, and Abilify before and that she did not want to take Haldol, although she had not previously used it, because of the side effects from the other medications.[4] P.R.G. said that in 2008, she had reached the point where she did not have to take any kind of psychoactive medication and had done well without it, starting college and taking care of her children. She said that she was a semester and a half from graduating with an associate's degree in drug and alcohol counseling and an associate's degree in sociology.

---

[4]P.R.G. said that the side effects from the medications she had taken before made her heart feel like it was "about to bust," and said, "I get to where I can't move; I can't function; I can't cook; I can't take a bath; I drool at the mouth. I don't want to get up and go to class. I don't want to get up and go to work. All I want to do is lay and sleep."

10

P.R.G. gave the following testimony about her interaction in her competency classes, the "verbally abusive" incident, and hearing voices:

A. I'm taking competency classes, and it [coincides] with my competency with my drug and alcohol counseling. I'm making a hundred on my tests. I'm very active. I'm very talkative. I'm learning from my experience in my competency. My teacher has stated—his name is Steven—he said if he had got notice before, he was willing to come and testify for me. He feels I don't need the psychotic medications for my competency. He doesn't understand why I'm being diagnosed as still needing it. But if it was set to be, my court hearing was put off, he would come and testify. My experience in class, he doesn't feel for competency that because of my tests and how I interact in class that I need psychotic meds to be competent.

Q. How about the RN that I asked Dr. Atkinson about? Tell us about that.

A. His name is Chris. I don't know his last name. I asked him, would he come and testify for me, how I interact with the patients and the staff. He said, yes. He haven't [sic] seen any violence in me to where he feels that I need medication, but it was other staff members because I had gotten into it with a staff member about getting smart with me, and I walked off grinning walking down the hall. And then she wrote up, saying that I was being uncooperative and stuff because I asked her a question about a bath or something. I asked her something and she played me off like I wasn't nothing. And I told her just because I'm a patient here, she shouldn't talk to me like I'm crazy. I'm a person, too, and that's what started it. So I walked down the hall and walked out of her face when she was talking smart to me, and I just started singing to myself and talking to the other patients like I do every morning. I get up every morning; I talk to all the patients: Good morning; how are you doing. The ones I'm close to, I ask them how they feel, if they want to talk, if they have anything wrong they want to discuss or just try to be friendly to make all of our stay in the hospital good.

Q. Let me ask you this. The doctor indicates that he—I think that he has reports that you're talking to unseen others or hearing voices. Are you having those problems?

11

A.  No, sir.  I haven't experienced it, not one time.

Q.  Do you feel like you are delusional as you sit here today?

A.  No, sir.

Q.  You have made a decision that you don't want to take the medicine, and that's because why?

A.  Because when I was diagnosed with schizophrenia, it was because of drug use with cocaine.  If you see my records from '07–'08 when I was here, I was diagnosed with schizophrenia for cocaine usage, not because I was out and got into it with a family member or police officer.  It was because of cocaine use.  It wasn't just regular schizophrenia.

Q.  Do you think if you don't take the medicine, that Dr. Atkinson is correct that you'll—that you'll get worse, that you'll be more likely to be at risk of self-harm or aggression towards others?

A.  No, because I have—I have no feelings of doing harm to anybody nor myself.  I'm not doing drugs anymore.  I'm working on being clean.  Like I said, the—it was just past experience from drug use.  I get along with my kids, family and friends.

## C.  Analysis

### 1.  Danger

In part of her first issue, P.R.G. complains that with regard to the trial court's findings under section 574.106(a-1)(2)(A), there is no evidence to show that she presents a danger to herself or others in the inpatient mental health facility.

To make such a finding, the trial court had to consider (1) an assessment of P.R.G.'s present mental condition, (2) whether she had inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm to herself or

12

another while in the facility; and (3) whether, in the six months preceding the date she was placed in the facility, she had inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm to another that resulted in her being placed in the facility. *See* Tex. Health & Safety Code Ann. §§ 574.106(a-1)(2)(A), 574.1065 (West 2010). However, as set out above, the evidence at the hearing reflected only P.R.G.'s present mental condition. Although P.R.G. had a pending assault charge and was in the inpatient mental health facility in order to regain competency so that she could stand trial for that offense, the record does not reflect when the alleged assault occurred, and there is no evidence in the record that P.R.G. had inflicted, attempted to inflict, or made a serious threat of inflicting substantial physical harm to herself or another while in the inpatient mental health facility. *See, e.g., Moore*, 2011 WL 3587439, at *5 (holding that doctors' testimonies that appellant was loud and verbally intimidating but that appellant had not behaved in an assaultive or aggressive manner and had not struck anyone constituted evidence insufficient to support the finding that she presented a danger to herself or others in the inpatient mental health facility). Therefore, we sustain this portion of P.R.G.'s first issue and do not reach the remaining portion. *See id.*; *see also* Tex. R. App. P. 47.1.

## 2. Capacity

In part of her second issue, P.R.G. argues that the evidence is legally and factually insufficient to support a finding that she lacks capacity under section 574.106(a-1)(1). "Capacity" under section 574.106(a-1)(1) means a patient's

13

ability to understand the nature and consequences of the proposed treatment, including the benefits, risks, and alternatives to the proposed treatment, and to make a decision whether to undergo the proposed treatment. Tex. Health & Safety Code Ann. §§ 574.101(1) (West 2010), 574.106(a-1)(1); *E.G.*, 249 S.W.3d at 730.

P.R.G. had been ordered into inpatient mental health treatment by the criminal district court to regain competency to stand trial for an assault charge, and Dr. Atkinson testified that P.R.G. was being treated for schizophrenia (schizoaffective with bipolar paranoid features) and that an antipsychotic medication like Haldol would help decrease P.R.G.'s agitation, stop her from hearing voices, prevent further deterioration of her condition, improve her quality of life, and help her regain competency. He indicated that if P.R.G.'s condition continued to deteriorate, she might become dangerous to herself or others.

As set out above in our recitation of the evidence presented at the hearing, Dr. Atkinson described the side effects of the medication, some of which he said could be corrected through other medication. In both his application and in his testimony, Dr. Atkinson indicated that there were no medical alternatives that would likely produce the same benefits and that therapy classes would not be sufficient to restore P.R.G. to competency. Dr. Atkinson testified that he did not

know if P.R.G. understood the risks and benefits of the medication because she did not think that she was ill.[5]

P.R.G. denied hearing voices and said that she did not feel like she was delusional and that her schizophrenia diagnosis in 2008 had been based on cocaine use and was not "regular schizophrenia." She also said that she did not think she would get worse and that she had "no feelings of doing harm to anybody" or to herself. Nonetheless, Dr. Atkinson testified that prior to her 2008 admission into the mental health facility, P.R.G. had stopped taking her medication, leading to "some domestic issues, violence and such," and indicated that prior to her current assault charge, P.R.G. "had not been compliant with taking her medication."

Viewing the evidence in the light most favorable to the finding and giving deference to the trial court's determination of the witnesses' credibility and demeanor, the trial court could have formed a firm belief or conclusion that P.R.G.'s mental illness prevented her from having the capacity to make a decision regarding the administration of psychoactive medication. Therefore, we

---

[5]Dr. Atkinson also indicated that he did not discuss with P.R.G. the risks and benefits of the medication, and he rested his assumption that another doctor had discussed these with P.R.G. on the other doctor's note that he had offered to start P.R.G. back on Abilify, Seroquel, or Risperdal. P.R.G. testified that she had taken Seroquel, Risperdal, Zoloft, and Abilify in the past and had experienced unpleasant side effects from these medications but that she had not previously taken Haldol. The issue before us is P.R.G.'s capacity—her ability to understand and make a decision—not the information she received, particularly as she was present at the hearing and heard Dr. Atkinson's testimony about the side effects before she testified.

15

conclude that the evidence is legally sufficient to support the trial court's capacity finding. *See K.E.W.*, 315 S.W.3d at 20; *D.P. v. State*, Nos. 01-09-00097-CV, 01-10-00002-CV, 2010 WL 376007, at *8 (Tex. App.—Houston [1st Dist.] Feb. 4, 2010, no pet.) (mem. op.) (holding evidence legally sufficient to support capacity finding when physician testified that appellant lacked capacity because he was delusional and did not think he was sick).

Further, although P.R.G. complained about the side effects of her previous medications and attempted to excuse her schizophrenia diagnosis based on drug use, most of her testimony focused on her efforts to regain competency instead of showing that she had the capacity to make a decision regarding the proposed treatment. Therefore, we conclude that the evidence is also factually sufficient to support the trial court's capacity finding. *See H.R.M.*, 209 S.W.3d at 108; *see also D.P.*, 2010 WL 376007, at *8–9 (concluding that evidence that appellant lacked capacity was factually sufficient when the evidence showed that appellant denied the fact that he suffered from paranoid schizophrenia, which was otherwise unrefuted, and indicated that his difficulties over the years had been caused by medication and not his mental illness). We overrule this portion of P.R.G.'s second issue.

### 3. Best Interest

In the remaining portion of P.R.G.'s second issue, she challenges the legal and factual sufficiency of the evidence to support the trial court's best interest finding.

In making its best interest findings under either ground of section 574.106(a-1), the trial court shall consider: (1) the patient's expressed preferences regarding treatment with psychoactive medication; (2) the patient's religious beliefs;[6] (3) the risks and benefits, from the patient's perspective, of taking psychoactive medication; (4) the consequences to the patient if the psychoactive medication is not administered; (5) the patient's prognosis if she is treated with psychoactive medication; (6) alternative, less intrusive treatments that are likely to produce the same results as treatment with psychoactive medication; and (7) less intrusive treatments likely to secure the patient's agreement to take the psychoactive medication. Tex. Health & Safety Code Ann. § 574.106(b).

P.R.G. expressed that she did not want to take the medication because of the side effects she had experienced from the medications she had taken before and because she did not think she needed it to regain competency, she had not been hearing voices and was not delusional, and her 2008 schizophrenia diagnosis had been cocaine-related.

Dr. Atkinson testified that an antipsychotic medication like Haldol would help decrease P.R.G.'s agitation, stop her from hearing voices, prevent further deterioration of P.R.G.'s condition, improve her quality of life, and help her regain competency. He indicated that if P.R.G.'s condition continued to deteriorate, she

---

[6]There was no testimony about P.R.G.'s religious beliefs.

17

might become dangerous to herself or others. He also described the side effects—some permanent—that the medication could cause.

In his application, Dr. Atkinson stated that P.R.G.'s prognosis was "fair" with psychoactive medication treatment, and he testified that there were no medical alternatives that would likely produce the same benefits, that therapy classes would not be sufficient to restore P.R.G. to competency, and that there were no less intrusive treatments likely to secure P.R.G.'s agreement to take the medication.

Viewing the evidence in the light most favorable to the best interest finding, we hold that the trial court could have reasonably formed a firm belief or conviction that treatment with Haldol was in P.R.G.'s best interest. *See K.E.W.*, 315 S.W.3d at 20; *see also M.H. v. State*, No. 01-09-00205-CV, 2009 WL 2050988, at *4–5 (Tex. App.—Houston [1st Dist.] July 16, 2009, no pet.) (mem. op.) (concluding that the evidence was sufficient to support the trial court's best interest finding when appellant did not present any evidence to dispute physician's testimony about the treatment's benefits and lack of alternative treatments for appellant's bipolar disorder with manic and psychotic features). Likewise, based on the entire record, we hold that the trial court could have reasonably formed the same firm belief or conviction, based on its determination of the witnesses' credibility and the weight to be given their testimonies. *See H.R.M.*, 209 S.W.3d at 108–09. Therefore, we overrule the remaining portion of P.R.G.'s second issue.

## IV. Conclusion

Having sustained part of P.R.G.'s first issue, concluding that there is no evidence to support the trial court's finding that "the patient presents a danger to the patient or others in the inpatient facility in which the patient is being treated as a result of a mental disorder or mental defect as determined under Section 574.1065, Texas Health and Safety Code," we delete that finding from the trial court's order. Having overruled P.R.G.'s second issue, we affirm the trial court's order as modified.

BOB MCCOY
JUSTICE

PANEL: GARDNER, MCCOY, and MEIER, JJ.

DELIVERED: November 8, 2012