# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00496-CV

**In the Interest of A. H.**

### FROM THE COUNTY COURT AT LAW NO. 3 OF BELL COUNTY
### NO. 8261, HONORABLE REBECCA DEPEW, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In June 2012, Bell County filed an application for court-ordered temporary mental health services, seeking to have appellant A.H., who was in custody in the county jail, committed for observation and treatment in a mental hospital. Following a hearing, the trial court signed a writ of commitment, ordering A.H. committed to the Austin State Hospital. As grounds, the court found that A.H. was mentally ill; that, as a result, she was likely to cause serious harm to herself; and that, if not treated, she would continue to suffer severe and abnormal mental, emotional or physical distress, her ability to function independently would continue to deteriorate, and she was currently unable to make rational, informed decisions about whether to submit to treatment. *See* Tex. Health & Safety Code § 574.034(a). A.H. appeals, contending that the evidence is insufficient to support the grounds for her commitment. Specifically, she argues that the State did not provide clear and convincing evidence that she was a danger to herself or that her condition was deteriorating such that she could not provide for her basic needs. We affirm the trial court's writ of commitment.

**Discussion[1]**

A trial court may order temporary inpatient mental health services if it finds by clear and convincing evidence that the proposed patient is mentally ill and as a result (1) is likely to cause serious harm to herself; (2) is likely to cause serious harm to others; or (3) is suffering severe and abnormal mental, emotional or physical distress, is experiencing substantial mental or physical deterioration of her ability to function independently, and is unable to make a rational and informed decision about whether to submit to treatment. *Id.* The evidence must include expert testimony and must show a "recent overt act or a continuing pattern of behavior that tends to confirm" the likelihood of serious harm to the proposed patient or to others or her distress and the deterioration of her ability to function. *Id.* § 574.034(d). We review a trial court's commitment order under the standards explained in *State v. K.E.W.*, 315 S.W.3d 16, 20-24 (Tex. 2010).

A.H. argues that the record is "devoid" of testimony showing that she is a danger to herself and that the evidence was insufficient to show that she was experiencing severe and abnormal distress or a deterioration in her ability to function or that she was unable to make rational and informed treatment decisions. She asserts that the medical testimony provided by Dr. Philip Scott was conclusory and cannot support the trial court's order. We disagree.

A.H. had been committed to the state hospital for about five weeks in early 2012 and after her return to the jail in early March 2012, had been volatile, defiant, angry, aggressive, threatening, and uncooperative with jail employees; flooded her cell and laid down in the water;

---

[1] The facts are well-known to the parties, and we will not recite them in detail in this opinion. *See* Tex. R. App. P. 47.1 (appellate court opinions should be as "brief as practicable"), 47.4 (memorandum opinions should be "no longer than necessary to advise the parties of the court's decision and the basic reasons for it").

destroyed her mattress; refused to take her psychiatric medications; and had been uncommunicative and "totally uncooperative" with her attorney. Dr. Charles Pierce concluded that A.H. exhibited rapid mood swings and "severely dysregulated" emotions; had "grossly impaired" judgment and delusional thoughts; suffered from bipolar and impulse control disorders; was not legally competent to stand trial; showed no reasonable likelihood of being restored to competency in the near future; and "must be considered a chronic threat due to past gestures and her severe illness." Pierce concluded that A.H. was likely to reject monitoring and case management and needed inpatient mental health care. Another doctor stated in a certificate of medical examination that A.H. showed signs of schizoaffective disorder with active manic and psychotic symptoms, threatened to kill people who "put[] handcuffs on" her, and grew agitated and abusive during an interview.

Dr. Philip Scott also interviewed A.H. and reviewed her records, concluding that she suffers from "schizoaffective disorder bipolar type." A.H. was disoriented to date and place and had disorganized speech and thought and rapid mood swings. Her thought process, perception of reality, and judgment were all impaired, and Scott believed it was possible that A.H. was likely to cause serious harm to herself, explaining that he "could see where she could be—place herself in danger of being harmed herself, such as, an example, walking out in traffic." He further believed she was likely to cause serious harm to others because she had threatened other people and assaulted a police officer. Scott said A.H. was suffering severe and abnormal distress, shown by her disorientation during the interview. Scott testified, "It's my presumption that she is experiencing a deterioration [in her ability to function independently]. We know that without appropriate treatment, especially when there is ongoing psychosis, that permanent brain damage can occur without appropriate treatment." He also said it appeared that, based on her records, disorganization of thought and

3

speech, and rapid mood swings, A.H. was homeless, incapable of caring for herself, and unable to make rational informed decisions about medical treatment.

Angela H., A.H.'s older sister, testified that she had adopted A.H.'s daughter because it was not safe for A.H. to care for the child or even to visit with her. Angela last saw A.H. about seven months before the hearing, when their brother called to say he had seen A.H. "walk down the streets." Angela said she went to get A.H. "like we normally do, [to] shower, feed her, dress her, clothe her, you know." During that visit, A.H. yelled at and threatened to hit the child, so Angela "put her out." Asked whether she thought A.H. might harm the child, Angela answered, "Yeah. I know she would." Angela said that A.H. had suffered from mental illness for more than fifteen years, since she was thirteen, and had been to at least seven hospitals. Medications did not seem to work because A.H. would stop taking them when released from psychiatric care. She said, "I think if she was permanently placed in a hospital facility to where she was being taken care of and not being released because she's knocked the interview, I think it would help her tremendously." She said that A.H. needed permanent care "where she can be treated every day, directed every day and encouraged every day in a facility" and that she needed to be there "[f]orever, for life, till she dies, permanent." Angela did not believe A.H. would ever be able to take care of herself.

Employees of the jail testified that during the year and one-half that she had been incarcerated, A.H. was moody; talked to people who were not there; would sometimes shower for two or three hours, until the water was turned off; and had threatened physical aggression, although she had not actually been physically aggressive. A.H. was being jailed in a separation cell because her mood swings and behavior were such that "we're just afraid she might actually harm somebody or maybe somebody might harm her." The jail mental health supervisor testified that he had worked

4

with A.H. for the last ten years and that she was sent from the jail to the state hospital five times in the last year because her "behavior had escalated to where she was either not safe to herself or to others." She would show improvement upon her return, but then would deteriorate because she would not take her medications regularly.

About two months before the hearing, a doctor at the state hospital found that A.H. was legally incompetent and showed no possibility of regained competence in the foreseeable future and that she therefore did not require further inpatient treatment to address her legal competence. Finally, there was evidence that in the year leading up to the hearing, A.H. was arrested four or five times for criminal trespass, once for shoplifting, and once for resisting arrest. A.H. had a pattern of refusing to leave a location when asked to do so by managers, police, or owners, and then becoming threatening or belligerent to customers, police, or employees. At one point during the hearing, A.H. interrupted the testimony and was removed from the courtroom.

The evidence is sufficient to support the trial court's commitment order under section 574.034(a)(2)(C). There was evidence that A.H. was disorganized in thought, suffered multiple and rapid mood swings, and did not know where she was or what the date was, leading Dr. Scott to conclude that she was suffering from severe and abnormal mental or emotional distress. Scott believed A.H.'s condition was deteriorating, noting that untreated mental illnesses worsened in severity over time. *See State ex rel. S.W.*, 356 S.W.3d 576, 583 (Tex. App.—Texarkana 2011, no pet.) (patient's "schizoaffective disorder of the bipolar-type," if not treated, would worsen over time, but patient was receiving treatment and had husband who would make sure patient continued with medication and treatment regimen). A.H., who has been in and out of jail for more than ten years,

5

had been arrested at least six times in the year before the hearing, usually because she would refuse to leave a business when asked and would become abusive and belligerent. She had also been hospitalized five times in the past year and was chronically homeless. Her family, when they saw her "walk[ing] down the streets," would pick her up to feed, bathe, and clothe her, but after A.H. threatened to assault her young daughter the last time, her sister had been forced to throw A.H. out of the house. A.H.'s sister believed A.H. needed to be committed permanently and would never be able to take care of herself, and A.H. consistently and repeatedly failed to take her medications of her own volition, a sign that she is unable to make rational, informed medical decisions. *See id*. Finally, Scott feared that, left to her own devices, A.H. could come to harm due to her disorganized thinking, and jail employees kept her separated from other inmates because they feared her behavior could cause someone else to harm her.

**Conclusion**

On this record, the evidence is both legally and factually sufficient to support the court's finding that A.H. should be committed under section 574.034(a)(2)(C). We need not consider whether commitment was also justified under section 574.034(a)(2)(A).

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed: March 14, 2014

6