

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-11-00438-CV

IN THE MATTER OF E.F.

----------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

In one issue, Appellant E.F. contends that the trial court erred by authorizing the administration of psychoactive medicine because the evidence is legally and factually insufficient to show that (1) she lacks the capacity to make a decision regarding the administration of the proposed medications and (2) treatment with the proposed medications is in her best interest. Because we hold that the evidence is legally insufficient to support the trial court's finding that E.F.

---

[1]*See* Tex. R. App. P. 47.4.

lacked capacity to make a decision regarding the administration of the proposed medications, we will reverse and render.

## II. FACTUAL BACKGROUND

Dr. Harvey Martin testified that he had known E.F. professionally for more than fifteen to twenty years as both an inpatient at Red River Hospital and in his private office, that she is currently under a court order to receive inpatient mental health services, and that she is being treated for bipolar disorder with psychosis and mild dementia, "a recognizable form of mental illness." He testified that E.F. had been exhibiting the following symptoms: unstable mood, some difficulty accurately assessing her own situation and her own condition, some problems with short-term and immediate memory, some difficulty with sleep, and some hyperirritability.

He also testified that E.F. had refused to take medications voluntarily. He stated that she lacked the capacity to make a decision regarding the administration of medicine. When asked why, he stated that "in the past, very modest doses of this type of medication have been, in [his] view and . . . the view of her family, very helpful, very stabilizing, and [he thought] it would allow her to function more like her normal self." His hope was that with the medication, E.F.'s irritability would improve, that her sleep would improve, and that "her capacity to embrace the idea that her family and her treating medical staff were trying to act on her best interest [would improve.]" Dr. Martin thought that the medications would enable E.F. to "better cooperate" and "to function in a more normal way."

Dr. Martin testified that he had "spent a lot of time trying [and had tried many times] to discuss the benefits and the risks, the potential side effects, and so forth at some length with [E.F.]  She's been very adamant that it would not be a consideration."

When asked whether she appeared to understand the benefits and side effects, he answered, "It's difficult to say.  Basically she stated that she wasn't going -- she wasn't open to discussion about it, was not open to considering it."  Further, he testified that she would not even allow him to carry out the appropriate monitoring tests for her blood thinner prescribed by doctors other than those practicing at Red River.

Dr. Martin testified that the side effects of the various requested medications are usually very minimal but admitted that sedation and gastric irritation were possible.  He stated that when E.F. had been on the same medications in the past, she had been "essentially side effect free" and that he did not recall specifically that she had shown any symptoms of side effects.  But he admitted that "[t]here may have been a small tremor at one point" before an adjustment in the medication.  He also admitted that there were some serious potential side effects, such as tardive dyskinesia or neuroleptic malignant syndrome, which have the potential to be life-threatening.  But Dr. Martin explained that those side effects

> were much more of a consideration with the older generation of what are called neuroleptics or antipsychotic medications, things such as Haldol, Thorazine, Mellaril, those kinds of medications.

3

One of the advantages of the newer generation of antipsychotics is the risk for tardive dyskinesia, for example, with this drug, while it's been reported, I've never seen it in any of my patients, and so the incidence of that is very low.

Additionally, the dosage range that we're talking about, at least in the past for [E.F.], has been comparatively relatively low.

Dr. Martin testified that he was familiar with the potential side effects and was specifically trained to watch for them. At E.F.'s counsel's urging, he promised that he would do so. Dr. Martin concluded that the benefits of the requested medications outweighed the possible side effects and that the medications were in her best interest.

Further, Dr. Martin testified that he did not believe there was any alternative to court-ordered medication. He stated that thus far in this round of court-ordered inpatient care, E.F.'s dementia with delusions and psychosis had not improved. He admitted that although she had been "very unwilling to take any of the additional [medications] that [he] ha[d] prescribed[, h]er others[, prescribed by other doctors,] have been [only] a little bit hit or miss."

Dr. Martin stated that the requested medications would not be as "helpful for her mental illness" if not taken consistently. He had therefore requested that the medications be ordered as intramuscular injections. He explained,

I guess the advantage is that once that's given, that there's not the daily resistance, the daily discussion about not taking it or taking it, and so it allows the medicine to be present. And it's in what's called a Depo form, which means that it's slowly released over time. There's the convenience of not having to take yet another pill orally. Those would probably be the two big benefits.

4

But he also stated that he was open to switching from intramuscular injections back to oral administration if E.F. improved on the medication.

E.F.'s testimony from the trial follows:

Q.   [T]he application that Judge Butler is hearing today deals with you being Court ordered to take certain medications. Do you understand that?

A.   Yes.

Q.   Do you want to take those medications?

A.   Well, what medications were Court ordered?

Q.   Well, none have been yet.

A.   Well, I don't think they should be. I object to this whole hearing. I was not—

Q.   Okay.

A.   What is it?

Q.   I was just going to ask you another question. Is that okay?

A.   Yes.

Q.   You don't want to take shots, do you?

A.   No. I don't have any reason to take shots. I take the medication when they hand it to me.

Q.   Okay. And you're telling us that you agree to take that medicine; is that correct?

A.   Well, I haven't taken some that are antipsychotic, because I'm not a psychotic.

Q.   Okay. And you don't want the Judge to order that you have to take medicine you don't want to take, do you?

A.   No, I don't want him to.

Q. Do you think that you'll be okay without the medicine that they want you to be Court ordered—

A. Well, I have been. I've been in the hospital there, and I've been without the medication. I've been normal as anyone on the street.

Q. You don't think you're irritable, or not sleeping good, or anything like that?

A. No, no, I am not. I am cooperative.

Q. All right. And you'll -- and you understand that you can get out of the hospital when you're cooperative, don't you?

A. Yes, I do. But I object to Dr. Martin. I fired him as my physician three weeks ago, and he has chased me around the hospital trying to give me medication and counsel. I don't want him as my physician. I told my husband that, and he went to Dr. Gonzalez and told him what the situation was, and Dr. Gonzalez said he would recommend a psychiatrist if it were needed.

Q. Do you agree to receive other kinds of treatments, like psychotherapy and other kinds of therapy treatments?

A. No. I am eighty-seven years old. Psychotherapy is not going to change me. I do not want Dr. Martin as my physician. He has done nothing to help me.

Q. I believe I'll—

A. He believes in nothing but drugs, and he pushes a prescription of drugs at you immediately. I object to that. I don't want drugs in my brain, carrying them around. It's just a lot of extra baggage. I don't need those.

On redirect examination, Dr. Martin explained that before "the first hearing,"[2] he had talked to E.F. and told her that he would continue to be her

___

[2]The record from that hearing is not in the record before us.

doctor until that hearing. He testified that after that hearing, he went to her room and told her the name of her new psychiatrist. According to Dr. Martin,

> she said, "Well, wait a minute. I'm still thinking about that. Let's don't do that yet." And so that's kind of where it remained until about three or four days ago, when I received a telegram, I believe, from [E.F.] saying, "Don't you remember, you are not -- you are no longer my physician?" And so I'm open to whatever is decided as far as that's concerned.

E.F. then spoke, "Your Honor, I do not want another psychiatrist at Red River Hospital. I do not want to be at that hospital again." Dr. Martin then continued his explanation to the trial court: "We spoke with [E.F.] about this matter this morning, and tried to explain that Dr. Gonzales . . . does not have privileges at Red River Hospital, and so any change of physician would have to be somebody who had admitting and clinical privileges at Red River."

After the doctor finished his answer, the following transpired:

THE COURT: Okay.

THE PATIENT: Doctor, the physicians—the conditions at Red River Hospital are objectionable to me. They take me to a shower, put me in a storage room, and leave me there to wait, then take me to a room where the toilet hasn't been cleaned in weeks, and there's excreta in the commode. And I'm supposed to take a shower in that bath. Now, I don't think I have to put up with that. I don't want that kind of a hospital.

After hearing the above testimony, the trial court found on the record that E.F. lacked "the mental capacity to make informed treatment [decisions] as to the medication" and found that such treatment with medications in the classes of antidepressants, antipsychotics, anxiolytics, sedatives, hypnotics, and mood

7

stabilizers was in E.F.'s best interest. At the conclusion of the court's findings, E.F. stated that she was going to appeal the trial court's findings.

## III. STANDARD OF REVIEW

Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010). Evidence that merely exceeds a scintilla is not legally sufficient when the burden of proof is clear and convincing. *Id.* In evaluating evidence for legal sufficiency under a clear and convincing standard, we review all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *Id.* We resolve disputed fact questions in favor of the finding if a reasonable factfinder could have done so, and we disregard all contrary evidence unless a reasonable factfinder could not have done so. *Id.*

## IV. SUBSTANTIVE LAW

Section 574.106 of the health and safety code governs this type of proceeding and related order. The statute provides in relevant part,

> (a) The court may issue an order authorizing the administration of one or more classes of psychoactive medication to a patient who:
>
> > (1) is under a court order to receive inpatient mental health services . . . [.]
>
> (a–1) The court may issue an order under this section only if the court finds by clear and convincing evidence after the hearing:

(1) that the patient lacks the capacity to make a decision regarding the administration of the proposed medication and treatment with the proposed medication is in the best interest of the patient . . . [.]

(b) In making the finding that treatment with the proposed medication is in the best interest of the patient, the court shall consider:

(1) the patient's expressed preferences regarding treatment with psychoactive medication;

(2) the patient's religious beliefs;

(3) the risks and benefits, from the perspective of the patient, of taking psychoactive medication;

(4) the consequences to the patient if the psychoactive medication is not administered;

(5) the prognosis for the patient if the patient is treated with psychoactive medication;

(6) alternative, less intrusive treatments that are likely to produce the same results as treatment with psychoactive medication; and

(7) less intrusive treatments likely to secure the patient's agreement to take the psychoactive medication.

Tex. Health & Safety Code Ann. § 574.106 (West 2010).

Section 574.101(1) provides the definition of capacity:

(1) "Capacity" means a patient's ability to:

(A) understand the nature and consequences of a proposed treatment, including the benefits, risks, and alternatives to the proposed treatment; and

(B) make a decision whether to undergo the proposed treatment.

*Id.* § 574.101.

9

## V. LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT FINDING THAT E.F. LACKS CAPACITY

E.F. argues that the evidence is legally and factually insufficient to support the trial court's finding that she lacks capacity. We focus on E.F.'s argument that the testifying physician could not provide any reasons why he testified that she lacked capacity.

As set forth above, Dr. Martin testified that E.F. lacked the capacity to make a decision regarding the administration of psychoactive medications. When asked why he believed that E.F. lacked such capacity, he stated that "in the past very modest doses of this type of medication have been, in [his] view and . . . the view of her family, very helpful, very stabilizing, and [he thought] it would allow her to function more like her normal self." His hope was that with the medication, E.F.'s irritability would improve, that her sleep would improve, and that "her capacity to embrace the idea that her family and her treating medical staff were trying to act on her best interest [would improve.]" Dr. Martin's testimony, however, does not demonstrate why E.F. lacked the capacity to make a decision regarding the administration of psychoactive medication; he did not link her diagnoses—i.e., bipolar disorder with psychosis and mild dementia—or her behavior to any lack of capacity. Thus, there was no factual testimony from Dr. Martin at the hearing supporting his conclusory opinion that he believed that E.F. lacked the capacity to make a decision regarding the administration of psychoactive medication. *See Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 839 (Tex. 2010) (holding that conclusory testimony constitutes no evidence); *City*

10

*of San Antonio v. Pollock*, 284 S.W.3d 809, 820 (Tex. 2009) (same); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (same); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711–12 (Tex. 1997) (same), *cert. denied*, 523 U.S. 1119 (1998).

The record instead reveals that E.F. is a well-spoken, eighty-seven year-old woman. She explained that she did not want to take antipsychotic medications because she was not psychotic. She testified that she had not taken the antipsychotic medications at times in the past and had been as "normal as anyone." She was alert to the conditions of her surroundings, and her testimony regarding the conditions of her surroundings was not controverted. And she was able to interact with the court, even to the extent of stating that she would appeal the decision.

Considering all of the evidence in the light most favorable to the trial court's finding, resolving disputed fact questions in favor of the finding if a reasonable factfinder could have done so, and disregarding all contrary evidence unless a reasonable factfinder could not have done so, we hold that a reasonable trier of fact could not have formed a firm belief or conviction that E.F. lacked the ability to understand the nature and consequences of administration of the proposed medications, including the risks, benefits, and alternative treatments or to make a decision whether to voluntarily take the proposed medications. *See* Tex. Health & Safety Code Ann. § 574.106(a–1)(1); *K.E.W.*, 315 S.W.3d at 20; *State ex rel. E.G.*, 249 S.W.3d 728, 732 (Tex. App.—Tyler 2008, no pet.); *see*

11

*also State ex rel. W.G.*, No. 12-08-00344-CV, 2009 WL 3790016, at *4 (Tex. App.—Tyler Nov. 12, 2009, no pet.) (mem. op.); *State ex rel. B.L.*, No. 12-08-00081-CV, 2008 WL 4117959, at *4 (Tex. App.—Tyler Sept. 3, 2008, no pet.) (mem. op.). Consequently, the evidence is legally insufficient to support the trial court's finding based on section 574.106(a–1)(1) of the Texas Health and Safety Code. Tex. Health & Safety Code Ann. § 574.106(a–1)(1). Having determined that the evidence is legally insufficient to support the statutorily required lack of capacity finding, it is unnecessary for us to address the portion of E.F.'s issue dealing with the trial court's best interest finding and her arguments that the evidence is factually insufficient to support the trial court's findings. *See* Tex. R. App. P. 47.1 (requiring appellate court to address only issues necessary to final disposition of the appeal). We sustain E.F.'s sole issue.

## VI. CONCLUSION

Having sustained E.F.'s sole issue, we reverse the trial court's order authorizing psychoactive medication and render judgment denying the State's application for an order to authorize psychoactive medications.


SUE WALKER
JUSTICE

PANEL: DAUPHINOT, WALKER, and GABRIEL, JJ.

DAUPHINOT, J. dissents without opinion.

DELIVERED: December 9, 2011

12