

# NUMBER 13-13-00422-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## FOR THE BEST INTEREST AND PROTECTION OF C.G.

### On appeal from the Probate Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides, and Longoria**
**Memorandum Opinion by Justice Benavides**

In this commitment case, appellant C.G.[1] contends that there was no evidence to support her order of commitment to Rio Grande State Center, or, in the alternative, that there was legally and factually insufficient evidence. We affirm.

---

[1] To protect appellant's identity and medical privacy, we use only her initials.

## I. BACKGROUND

On June 26, 2013, the Hidalgo County District Attorney's Office filed a Motion for an Order of Protective Custody for C.G. An Application for Temporary Commitment for Mental Illness was also filed that day. The application was accompanied by a sworn affidavit from a local hospital representative, Zifa Guerrero. In her affidavit, Guerrero testified that C.G. "had been wandering in traffic[,] causing traffic backups" and "was almost hit by a vehicle." The owner of the vehicle apparently stopped and called local police to report C.G.'s behavior. Police arrived and took C.G. to the hospital for a medical evaluation. Guerrero also testified that C.G. had "been diagnosed with schizophrenia" and was "currently refusing medication." Guerrero further testified that C.G.'s "mental condition is deteriorating to the point [where] she is a danger to herself and others." The trial court granted the motion.

On July 1, 2013, the trial court held a probable cause hearing to determine whether C.G. presented a substantial risk of harm to herself such that she should remain in the hospital pending the hearing on the application for court-ordered mental health services. The court found probable cause and, in its order, noted that "patient is schizophrenic and wandering into traffic."

On July 8, 2013, the court held a hearing on the State's application for temporary commitment for mental illness. It also heard the State's application for order to administer psychoactive medication. Dr. Daniel Villarreal, a board-certified psychiatrist with fifteen years of experience, testified for the State. Dr. Villarreal explained that C.G.'s main treating physician, Dr. Ramona Rogers, was ill and could not testify that day, but that he was also one of C.G.'s treating doctors. Dr. Villarreal diagnosed C.G. with psychosis and

2

schizophrenia. He stated that while C.G. had not displayed any overtly aggressive or violent behavior while in treatment, she had been disorganized and paranoid. He testified that, at the time of C.G.'s admission, she had been walking in traffic "to the point where she was not making rational decisions" and was "endangering herself." He further stated that C.G. refused to follow Dr. Rogers's treatment plan for her and was only partially compliant with her medication therapy. He stated that C.G. had been prescribed "sedatives and some antipsychotics, but she would always change her mind, reduce the dose, not take it, agree to take it, then reduce the dose again." He acknowledged, though, that she was attending therapy. Dr. Villarreal opined that, if C.G. was discharged from inpatient treatment, "she will continue to suffer with delusions and some paranoia" and could endanger herself again.

C.G.'s mother, E.G., also testified.[2] E.G. stated that her daughter was thirty-three years old, lived at home with E.G., and had been diagnosed with schizophrenia approximately three years prior to the incident at hand. E.G. stated that this was the fourth time that her daughter had been admitted to a hospital to receive inpatient mental health services. She testified that C.G. had stopped taking her medications in May of 2013. On June 26, 2013, the day that C.G. was taken into protective custody, E.G. reported that C.G. was sleep-deprived and had not eaten in approximately three or four days. C.G. apparently told E.G. that she was walking to the store for cigarettes. Later, a police officer came to E.G.'s home to report that C.G. had been walking in traffic. E.G. doubted this, because she knew her daughter to be a cautious walker. She also knew

---

[2] We use initials for appellant's mother for the continued purpose of protecting C.G.'s privacy and medical history.

3

that the road to the convenience store did not have a sidewalk, so her daughter had no choice but to walk on the road. E.G. asked the court to let her daughter return home, since now her daughter was "thinking normally." E.G. stated that she would help her daughter be compliant with her medications. E.G. also explained that the reason C.G. refused to take some medications at the hospital was because they made her dizzy.

C.G. testified on her own behalf. She explained that she used to study biology in college and was a former paramedic. However, when she was diagnosed with schizophrenia, she became discouraged and quit school and her job. C.G. explained that she walked to the store on June 26th to buy cigarettes. C.G. said that a man called the police and reported that he witnessed her almost getting hit by a car, but that his statement was not true. She said that she even spoke to this witness, who had been watching her walk to the convenience store. She stated that the witness told her, "you're sick," but she ignored him and went into the store. Later, she was apprehended by police while inside the convenience store. She testified that a police officer questioned her and took her in because she was allegedly "not responsive or thinking straight." C.G. explained that she did not take all of her prescribed medications while in the hospital because Dr. Rogers had warned her that some of the medicines could cause chest pains or a heart attack, and C.G. was "not going to wait for [that] to happen." Although C.G. stopped taking her antipsychotics, she continued to take her blood pressure medication, Metoprolol, and requested Ambien to help her sleep. She also took antibiotics and a cough syrup when she caught a cold while in the hospital. C.G. said that she willingly went to patient groups and only refused to take medicines that would give her side effects or make her dizzy.

4

The court also considered the "Physician's Certification of Medical Examination for Temporary Commitment," authored by C.G.'s treating psychiatrist, Dr. Rogers. In the certification, Dr. Rogers opined that C.G. was likely to cause serious harm to herself. She also wrote the following:

> She [C.G.] reports that I am "experimenting" with her with "trial and error." She reports I give her the "runaround" about her health care. She reports I prescribed her specific medications in the past, which I did not. She reports her mother was giving her "spoiled" food[,] which is why she was out walking as above [in traffic].

The probate court granted the State's application for temporary commitment for mental illness and application for order to administer psychoactive medication.[3] C.G. then filed this appeal.

## II. APPLICABLE LAW

Section 574.034 of the Texas Health and Safety Code provides the authority for a judge to grant inpatient or outpatient court-ordered mental health services. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034 (West, Westlaw through 2013 3d C.S.). The statute concerning inpatient services, which C.G. was ordered to undergo, provides as follows:

> (a)  The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:
>
> (1) the proposed patient is mentally ill; and
>
> (2) as a result of that mental illness the proposed patient:
>
>> (A) is likely to cause serious harm to himself;
>>
>> (B) is likely to cause serious harm to others; or

---

[3] We note that C.G.'s brief only challenges the order for commitment; it does not challenge the application to administer psychoactive medication.

5

(C) is:

> (i)      suffering severe and abnormal mental, emotional, or physical distress;
>
> (ii)     experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and
>
> (iii)    unable to make a rational and informed decision as to whether or not to submit to treatment.

*Id.*

To be clear and convincing under the statute, the evidence at the commitment hearing must include expert testimony and evidence of a recent overt act or a continuing pattern of behavior that confirms the likelihood of serious harm to the patient or others, or that the patient's ability to function will deteriorate. *Id.* § 574.034(d). An "overt act" can include both physical acts and verbal statements. *See State v. K.E.W.*, 315 S.W.3d 16, 22 (Tex. 2010). It must be objectively perceived and probative of a finding that serious harm, either to the patient or to others, is probable if the person is not treated. *Id.* at 24.

### III. STANDARD OF REVIEW

Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *K.E.W.*, 315 S.W.3d at 20 (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)). "Evidence that merely exceeds a scintilla is not legally sufficient when the burden of proof is clear and convincing." *Id.* (citing In re *J.F.C.*, 96 S.W.3d 256, 264–65 (Tex. 2002)).

6

In a legal sufficiency review where the burden of proof is clear and convincing evidence, "a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d at 266. "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *Id.*

In a factual sufficiency review where the State must prove its claims with clear and convincing evidence, "a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* (citing *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002)). The inquiry must be whether a factfinder could reasonably form a firm belief or conviction about the State's allegations. *See id.* "A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* "A court of appeals should detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding." *Id.*

7

## IV. DISCUSSION

By one issue, C.G. asserts that there was no evidence, or in the alternative, legally and factually insufficient evidence, to support the judgment and order of commitment. She also contends that the State failed to show a recent overt act or a continuing pattern of behavior tending to confirm the likelihood of serious harm to C.G.

In light of the evidentiary record, we disagree with C.G.'s contentions. Dr. Villarreal testified at the hearing that C.G. had been admitted for treatment when she was found wandering into traffic. He confirmed C.G.'s medical diagnosis as psychosis and schizophrenia. Dr. Villarreal stated that, although C.G. had not exhibited any violent behavior while in temporary treatment, she was disorganized and paranoid. He also testified that C.G. was only partially compliant with her prescribed pharmaceutical therapy: although she had been prescribed sedatives and some antipsychotic medications, C.G. would either refuse to take her medications or reduce her recommended dosages. Dr. Villarreal opined that C.G. would continue to suffer from delusions and paranoia and could endanger herself again if she was not admitted for inpatient treatment.

Dr. Rogers's certification report provided further evidence of C.G.'s paranoia. In her report, Dr. Rogers set forth that C.G. accused Dr. Rogers of "experimenting" with her health in a "trial and error" manner. C.G. also accused Dr. Rogers of prescribing specific medications in the past, which the doctor had not. Finally, Dr. Rogers reported that C.G. alleged her mother, E.G., fed her "spoiled" food, which was why she felt compelled to leave home and walk in traffic.

C.G.'s mother, E.G., confirmed that her daughter had been diagnosed as schizophrenic and had been admitted for treatment four times prior to this incident. She stated that her daughter had stopped taking her medications approximately two months prior to the incident which led to her inpatient admission, and that C.G. had not eaten or slept in the four days prior to the incident. C.G. herself, while on the stand, admitted that a total stranger had commented that she "was sick" at the convenience store, after observing her behavior. She also testified that the police officer that apprehended her told her she was "not responsive or thinking straight." Finally, she admitted that she was not fully compliant with her medication treatment, although she did voluntarily participate in therapy.

The evidence showed that the recent overt act of wandering in traffic could result in serious harm. This harm could have been experienced by C.G., if she was injured by a car, or by others, if pedestrians or drivers were distracted by C.G.'s erratic behavior. Further, C.G.'s continuing pattern of not eating, sleeping, or taking her medications properly could also indicate the likelihood of serious harm. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(d). Viewing all of the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that C.G. should be committed for inpatient treatment. *See In re J.F.C.,* 96 S.W.3d at 266. Accordingly, the evidence to support the judgment was legally sufficient. *See id.* Further, we also find that there was factually sufficient evidence to support the order for commitment because a factfinder could reasonably form a firm belief or conviction about the State's allegations. *Id.*; *see also In re C.H.*, 89 S.W.3d at 25. We overrule this issue. And, because we have found the evidence to be both legally and

9

factually sufficient to sustain the judgment, C.G.'s contention that there was no evidence to support the judgment is also overruled.

### V. Conclusion

We affirm the trial court's judgment.

_____
GINA BENAVIDES,
Justice

Delivered and filed the
19th day of June, 2014.