

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-16-00019-CV

THE STATE OF TEXAS FOR THE BEST INTEREST
AND PROTECTION OF H.S.

On Appeal from the County Court at Law No. 2
Hunt County, Texas
Trial Court No. M-11179

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

H.S. appeals from the trial court's judgment committing her to Terrell State Hospital for extended mental health treatment for up to twelve months. On appeal, H.S. argues that the evidence was legally and factually insufficient to support the judgment for mental health services. Because we disagree with H.S., we affirm the trial court's judgment.

*(1)     Evidence Relating to H.S.'s Mental Health*

H.S., a seventy-seven-year-old woman, "has an extensive history of mental illness dating back to the 1960's" that led to multiple hospitalizations throughout the years. She was also "chronically homeless." As a result of increasingly alarming symptoms and H.S.'s noncompliance with mental health treatment plans, Teresa Robertson filed an application for extended court-ordered mental health services for H.S.

*(a)     Facts Established in Prior Proceedings*

To establish a continuing pattern of behavior that could justify court-ordered extended mental health treatment, the State incorporated facts that led to the trial court's prior order for temporary mental health treatment in this case.[1] H.S. believed that she was a federal agent with the FBI and CIA. At her temporary commitment hearing, H.S. testified that she became a federal agent because "all of the Molly Sellers," whom she described as "morphodite[s]" with "no sex glands," "were tailing [her] so tight that [she] could not even make a phone call." H.S. claimed that the "Molly Sellers" forced her to come to Texas, were "very very strong," and needed to be

---

[1]H.S. previously appealed the trial court's temporary commitment order in cause number 06-15-00104-CV.

2

"arrested and put in a cell that cannot be broken." When asked if she had ever threatened to harm or kill anyone, H.S. testified,

> No, I haven't taken that advantage. I was assigned a gun or -- gun, but I never received it. It was supposed to be a firearm with a serial number and my name. I never received it. The FBI of Chicago sent me my ID and I never received that either. It wasn't until a few weeks later after I moved . . . . that I found out that Molly was going through my mail when the mailman came.

H.S. testified that she was estranged from all of her family and that her vehicle had been stolen. She claimed that she had an apartment at a United States military base and would reside there if the trial court so allowed.

The evidence at H.S.'s temporary commitment hearing established that she threatened to kill nursing staff after accusing them of engaging in a conspiracy against her. This action prompted Michelle McConnell to file an application for temporary court-ordered mental health services for H.S.

Dr. Paul M. Lee, a board-certified psychiatrist and neurologist, testified at the temporary commitment hearing that H.S. suffers from a "chronic paranoid-type" of schizophrenia that results in "very bizzare delusions that grossly impact her behavior" and ability to make rational decisions. Lee testified that H.S. was admitted to the hospital, "was having a great deal of rectal bleeding . . . that was very alarming to [the hospital's] gastroenterologist," and "was on a blood thinner that had substantially worsened the bleeding." However, "due to her delusional beliefs," H.S. was refusing medical care because she believed that the doctors (1) were involved in a Mormon conspiracy to harm her and (2) were not qualified to treat her unless they were federal agents. Lee also testified that H.S. refused to speak with him about her serious medical condition because she

3

believed he was a "morphodite." Lee stated that H.S. was unable to follow recommendations of health care providers for her "significant medical problems" and was selective about what medications she would take.

Concurring with Lee's conclusion that H.S. was a danger to herself and others, Dr. Mahmoud Mohamed filed a certificate of medical examination stating that H.S. is "acutely psychotic, . . . believes 'she is federal'. . . does not talk to anyone she does not believe to be federal," and is unable to care for herself. According to Mohamed, H.S. stated that "they" and the "Nazi[]s" were trying to kill her. Mohamed concluded that H.S. was an acute safety risk to herself and to others as a result of her delusional thought process.

At the conclusion of this hearing, the trial court ordered H.S. to undergo temporary mental health treatment. H.S. appealed the temporary order to this Court on the ground that it was not supported by legally sufficient evidence. We disagreed with H.S. and affirmed the trial court's judgment.

*(b)    Facts Established in These Proceedings*

After examining H.S. and noting her diagnosis of schizophrenia, Dr. Mark Messer, a psychiatrist with Terrell State Hospital, concluded that H.S. had "chronic psychosis," which led to delusions and "unprovoked verbal threats of aggression towards staff." He filed a certificate of medical examination opining that, if untreated, H.S. was likely to cause serious harm to others; would continue to suffer severe and abnormal mental, emotional, or physical distress; would continue to experience disorientation of her ability to function independently; and would be unable to make a rational and informed decision as to whether to submit to treatment. Messer also swore

4

that H.S. "suffers from a long-lasting, difficult[-]to[-]treat psychosis that renders her a danger to others."

Concurring with Messer, Dr. Charles Mathis also filed a certificate of medical examination reaching the same conclusions. Mathis' certificate stated,

> [H.S.] experiences prominent paranoid delusions, and grandiose delusions, resulting in her believing that she is employed by the CIA, and FBI, and that she has a license to kill; she threatened to kill employees at a long-term care facility, and others; while she has improved, she remains significantly psychotic, and because of those delusions has proven to be difficult to find placement.

According to Mathis, H.S. is "notorious for treatment noncompliance, treatment resistant schizophrenia, and a history of multiple psychiatric hospital admissions requiring extended stays, as well as outpatient commitment."

At the final commitment hearing, Dr. Mohamed El Awady, a board-certified psychiatrist practicing at Terrell State Hospital, testified about H.S.'s mental illness and history of mental health treatment in New York, Utah, New Mexico, and several hospitals in Texas. El Awady testified,

> She suffers from paranoid grandiose delusions. Believes that there [are] entities that she calls maphrodite [sic]. And these entities do not have organs or sexual glands and they survive among either human race by taking the form of human beings. And these **maphordities including a person named Molly has been preventing her from taking her belongings which is the *Chicago Times* and the *Chicago Tribune* newspapers.
>
> She reports they have been also in corporation [sic] with the Nazi movement to take over the government of the United States. And when I asked her about the court hearing, she reported that the court system has been infiltrated by the Nazi movement. . . .
>
> She hasn't been having any recent episodes of agitation or aggression. But she mentions that she has been trained by the CIA and the FBI to be a killer, and

that she can do that if she has the permission to do so, and if it's justifiable. And when I asked her about justifiable, she mentioned that somebody would be breaking the law. And according to her the maphrodites [sic] have been breaking the law. She tried to threaten staff before and that precipitated admission this time. . . .

[S]he keeps identifying different staff and different patients as maphrodite [sic] and we're afraid that she is going to act out and try to hurt them as justified by which she mentioned earlier.

El Awady concluded that H.S.'s condition was likely to continue for more than ninety days, and that inpatient hospitalization was the least restrictive means of providing care for H.S.'s psychiatric needs.[2]

*(2)    Standard of Review*

"[A] State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *State ex rel. S.W.*, 356 S.W.3d 576, 579 (Tex. App.—Texarkana 2011, no pet.) (citing *O'Connor v. Donaldson*, 422 U.S. 563, 576 (1975)). "The requirements for an involuntary commitment are strict because an involuntary commitment is a drastic measure." *Id.* "The evidentiary standards for involuntary commitment are high." *State ex rel. E.E.*, 224 S.W.3d 791, 794 (Tex. App.—Texarkana 2007, no pet.).

"In reviewing legal sufficiency, we analyze 'whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.'" *State ex rel. L.T.*, 386

---

[2]A previously entered temporary order provided for the administration of psychoactive drugs to H.S. El Awady explained that medication was necessary for H.S.'s treatment, but that she had stopped taking her medication and believed it was no longer necessary. He testified that H.S. would need anti-depressants, anti-psychotics, mood stablizers, sedatives, and hypnotics and explained the reasons why each medication might be necessary. The trial court entered another order authorizing the administration of psychoactive medication during her extended commitment. H.S. has also appealed that order in our cause number 06-16-00033-CV.

S.W.3d 271, 274 (Tex. App.—Texarkana 2012, no pet.); *Williams v. Nationstar Mortg.*, 349 S.W.3d 90, 92–93 (Tex. App.—Texarkana 2011, pet. denied); *see City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). "We are to consider all of the evidence in the light most favorable to the verdict, indulging every reasonable inference that would support it." *L.T.*, 386 S.W.3d at 274 (citing *Wilson*, 168 S.W.3d at 822). "The fact-finder is the only judge of witness credibility and weight to give to testimony." *Id.* "We 'cannot substitute our judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement,' but when the evidence allows only one inference, "the reviewing court may [not] disregard it." *Id.* (quoting *Wilson*, 168 S.W.3d at 822).

"In reviewing factual sufficiency challenges, we review all the evidence in the record, both that in support of and contrary to the trial court's findings." *Id.* (quoting *State ex rel. L.H.*, 183 S.W.3d 905, 910 (Tex. App.—Texarkana 2006, no pet.)). "Under the clear and convincing standard, we determine whether the evidence is such that the trier of fact could reasonably form 'a firm belief or conviction' as to the truth of the allegations sought to be established by the State." *Id.* (quoting *L.H.*, 183 S.W.3d at 910). "We consider whether the disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in favor of its finding." *Id.*

Under Section 574.035(a) of the Texas Health and Safety Code, a court may order a proposed patient to receive extended inpatient mental health services only if the fact-finder concludes from clear and convincing evidence, that:

(1)     the proposed patient is a person with mental illness;

7

(2)     as a result of that mental illness the proposed patient:

    (A)     is likely to cause serious harm to himself;

    (B)     is likely to cause serious harm to others; or

    (C)     is:

        (i)     suffering severe and abnormal mental, emotional, or physical distress;

        (ii)     experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

        (iii)     unable to make a rational and informed decision as to whether or not to submit to treatment.

(3)     the proposed patient's condition is expected to continue for more than 90 days; and

(4)     the proposed patient has received court-ordered inpatient mental health services under this subtitle or under Chapter 46B, Code of Criminal Procedure, for at least 60 consecutive days during the preceding 12 months.

TEX. HEALTH & SAFETY CODE ANN. § 574.035(a) (West Supp. 2015).

*(3)     Analysis*

Only one of the findings under Section 574.035(a)(2) is required. Here, based on El Awady's express testimony, the trial court found that H.S. was likely to cause serious harm to others and that she would continue to suffer severe and abnormal mental, emotional, or physical distress if not treated. The trial court also found that H.S. had a continuing pattern of behavior that tended to confirm the likelihood of serious harm to herself or others. After noting that H.S. had

received court-ordered inpatient mental health services for at least "60 consecutive days within the 12 months immediately preceding the hearing," the trial court ordered H.S. to undergo extended mental health treatment for a period of up to one year. H.S. does not challenge the finding that she is mentally ill. Instead, she argues that the evidence was not legally and factually sufficient to support the trial court's Section 574.035(a)(2) findings.[3]

"[E]vidence of psychosis, hallucinations, or delusions, without more, cannot justify involuntary commitment." *L.T.*, 386 S.W.3d at 275 (citing *S.W.*, 356 S.W.3d at 579, 583). The State had the burden of establishing the Section 574.035(a)(2)(B) ground "by clear and convincing evidence, meaning that 'degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting *L.H.*, 183 S.W.3d at 909). An expert diagnosis, without more, is insufficient to confine a patient for compulsory treatment; the State must present evidence of the behavior of the proposed patient that provides the factual basis of the expert opinion. *Id.* (citing *E.E.*, 224 S.W.3d at 794). To meet the clear and convincing standard, expert testimony is required, and there must be "evidence of a recent overt act or a continuing pattern of behavior that tends to confirm . . . the likelihood of

---

[3]El Awady specifically testified that he believed H.S. was a danger to herself and that her substantial mental deterioration of her ability to function independently was exhibited by her inability to provide for her health or safety and that she was unable to make a rational and informed decision as to whether to submit to treatment. The trial court determined that, as a result of her mental illness, H.S. could not provide for her basic needs and was unable to make rational and informed decisions as to whether or not to submit to treatment. It also determined that H.S. exhibited a continued pattern of behavior establishing her distress and the deterioration of her ability to function. Because we determine that the evidence was legally and factually sufficient to support the trial court's finding under Section 574.035(a)(2)(B), we need not address H.S.'s arguments under Section 574.035(a)(2)(C).

9

serious harm to the proposed patient or others." TEX. HEALTH & SAFETY CODE ANN. § 574.035(e) (West Supp. 2016).

H.S. argues that the State failed to meet this standard because the evidence is insufficient to demonstrate a recent overt act or a continuing pattern of behavior that meets the Section 574.035(e) requirements.[4] She contends that the evidence presented at trial amounted to "nothing more than a concern on the part of the doctors that Appellant might, at some point, harm another." In support of her argument, H.S. refers to El Awady's testimony that H.S. was not under restraints and had not yet made any effort to harm anyone.[5]

"[W]hen the words expressed by a person that has a mental illness foreshadow violence, the Legislature has permitted the law's intervention to prevent serious injury to others." *State v. K.E.W.*, 315 S.W.3d 16, 22 (Tex. 2010). Since H.S.'s verbal statements were enough to confirm the likelihood by clear and convincing evidence, actual harm was not a prerequisite to the court's finding that H.S. exhibited a continuing pattern of behavior that tended to confirm the likelihood of serious harm to others. *See id*. at 21–22 ("[A] proposed patient's words are overt acts," which "can be relevant both to determining whether he is mentally ill and also to predicting what actions he might or will take in the future as a result of his mental illness.").

Here, we find that the evidence established a continuing pattern of behavior that tended to confirm the likelihood of serious harm to others. The evidence established that H.S. believed that

---

[4]In her brief, H.S. focuses on the alleged lack of a recent overt act. The trial court's ruling relied on a continuing pattern of behavior.

[5]He also testified that, although H.S. had stopped taking her medication and believed it was no longer necessary, he was not aware of any specific task that she was unable to perform that was required to take care of her basic needs.

she was trained by the CIA and FBI to be a killer, that others were trying to kill her, and that she had a license to kill that would justify her harming others. These beliefs had persisted since McConnell filed the application for temporary mental health treatment on December 4, 2015. H.S. had previously threatened to harm staff and indicated that she had not yet "taken [the] advantage" of harming others because her government-issued firearm had not yet arrived. She had previously accused nursing staff of engaging in a conspiracy against her and had shown "unprovoked verbal threats of aggression towards staff." While in treatment, El Awady testified that "she keeps identifying different staff and different patients a[s] maphrodite [sic]."[6] Due to the nature of her delusions, El Awady believed she was going to act out on them unless treated. He explained that H.S. had not yet harmed anyone because she was under constant, one-on-one supervision.

After reviewing the record, we conclude that the record shows by clear and convincing evidence that the trial court could have reasonably formed a firm belief or conviction that H.S. is mentally ill and as a result of that illness, as confirmed by her continuing pattern of behavior, was likely to cause harm to others. Thus, we conclude that the evidence is legally and factually sufficient to support the trial court's judgment.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted: May 20, 2016
Date Decided: May 27, 2016

---

[6]This statement, combined with H.S's recent statements to El Awady that she is a trained killer who has permission to kill morphodites, could have led the trial court to find a recent overt act tending to confirm the likelihood of serious harm to others.

11