**Affirmed and Memorandum Opinion filed June 25, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00394-CV

## THE STATE OF TEXAS FOR THE BEST INTEREST
## AND PROTECTION OF K.S.

**On Appeal from Probate Court No. 3**
**Harris County, Texas**
**Trial Court Cause No. I253315**

## MEMORANDUM OPINION

Appellant, K.S., appeals an order for temporary inpatient mental health services and an order authorizing administration of psychoactive medication. *See* Tex. Health & Safety Code §§ 574.034; 574.106(a)(1). Appellant contends the evidence is legally and factually insufficient to support both orders.[1] We affirm.

---

[1] Although the period for which appellant was ordered to receive services has expired, we have jurisdiction and are not required to dismiss the appeal for mootness. *State v. Lodge*, 608 S.W.2d 910, 912 (Tex. 1980); *see also State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010).

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant's records reflect this proceeding arises from appellant's second admission to Harris County Psychiatric Center ("HCPC"). Following appellant's release after his first admission to HCPC, appellant was not compliant with his aftercare treatment.

Appellant's is a 30-year-old male from Nepal. He attended college in the United States and graduated with a degree in engineering. Appellant was working as a design engineer until the company told him "to take time off." Prior to that, appellant had been continuously and successfully employed. Appellant is indigent, with no income or savings or insurance benefits. Appellant has a past psychiatric history of bipolar disorder with psychotic features. He has a previous diagnosis of anxiety disorder and depression. Appellant has made grandiose statements. Appellant approached a security guard at a Walmart store and asked him to call the police. At that time, appellant was non-compliant with his medication and was noted to be internally preoccupied. Appellant's delusions consisted of being harassed by others and making nonsensical remarks.

After the Walmart guard called the police, an officer arrived and spoke to appellant. Appellant told the HPD officer he was hearing voices and had not been taking his medication. Appellant was taken to the Neuropsychiatric Center ("NPC") in Houston, Texas. The State sought court orders to commit appellant for temporary inpatient mental health services and to administer psychoactive medication. *See* Tex. Health & Safety Code §§ 574.034; 574.106(a)(1). Angela Williams, on behalf of the State, filed an application for temporary or extended mental health services for appellant. According to her affidavit, appellant was off his medication and hearing voices. Williams averred that appellant was "psychotic with internal stimuli" and "unable to care for himself at this time."

2

The HPD officer who took appellant to NPC filed a Notification of Emergency Detention in the probate court. In his notification of emergency detention for appellant, the officer stated that he had reason to believe appellant evidenced a substantial risk of serious harm to himself or others based upon the fact that appellant told the officer "that he was hearing voices to hurt himself. He stated has not been taking his medication. He stated he has been in and out of mental hospital." The officer had reason to believe the risk of harm was imminent unless appellant was immediately restrained and stated his belief was based upon the fact that appellant "appears to be danger to self/others." The officer reported that appellant asked a Walmart security guard for help calling the police.

Appellant was assessed by Dr. Chris Johnson. Johnson's diagnosis of appellant was "psychosis" and he stated that as a result of appellant's mental illness, he (1) is likely to cause serious harm to himself; or (2) is suffering severe and abnormal mental, emotional, or physical distress; (3) is experiencing substantial mental or physical deterioration of his ability to function independently, except for reasons of indigence, to provide for his basic needs, including food, clothing, health or safety; and (4) is not able to make a rational and informed decision as to whether to submit to treatment. As the factual basis of his opinion, Dr. Johnson stated, "[appellant] has been off treatment. He approached a guard at Wal-Mart reporting suicidal thoughts. He appears grossly psychotic at PES/actively responding to internal stimuli." Dr. Johnson's opinion was that, based on these same facts, appellant presented a substantial risk of serious harm to himself or others if not immediately restrained. According to Dr. Johnson, emergency detention was the least restrictive means to affect the necessary restraint because of the risk of injury.

Appellant was transferred to HCPC. Dr. Tyler Kimm examined appellant on May 1, 2018. Dr. Kimm diagnosed appellant with bipolar disorder and opined that

appellant was likely to cause serious harm to himself. The factual basis of Dr. Kimm's opinion was that appellant was brought in "after allegedly making suicidal statements at a Walmart." Dr. Kimm was of the opinion that because of appellant's mental illness, he presented a substantial risk of serious harm to himself, as evidenced by the following:

> "At HCPC [appellant] has been lewd, intrusive, hypersexual, [with] poor boundaries. [Appellant] has low sleep hours with only partial medication adherence. [Appellant] remains grandiose & accelerated in thought, speech."

Dr. Kimm stated that emergency detention was the least restrictive means to effect necessary restraint. He further stated in his report that the basis for his opinion of appellant's imminent risk of harm to himself, unless restrained, was the need for patient stabilization.

In his petition for an order to administer psychoactive medication, Dr. Kimm stated that he diagnosed appellant with bipolar disorder and determined that the proper course of treatment, in the best interest of the appellant, was the administration of certain classes of psychoactive medications. Further, Dr. Kimm believed appellant lacked capacity to make a decision regarding administration of psychoactive medication because appellant was refusing all medications but lurasidone, which despite several days of treatment failed to alleviate the symptoms of appellant's mental illness as evidenced by appellant's "continued poor boundaries, intrusiveness, grandiosity." Dr. Kimm also stated that appellant's past outpatient treatment with lurasidone failed, as evidenced by his recent re-admission.[2] Dr. Kimm's prognosis for appellant, if treated with the recommended psychoactive medications, was guarded but optimistic. Dr. Kimm opined that if the recommended psychoactive medications were not administered, the consequences to appellant

---

[2] As indicated below, appellant had been admitted three months prior to this admission.

would be a further decline in his ability to function. Dr. Kimm stated that he had considered prolonged hospitalization in a therapeutic environment as an alternative, but determined it would be unlikely to fully resolve appellant's current symptoms.

At the hearing, Dr. Douglas Samuels, a licensed psychiatrist at HCPC, and Michael Helminiak, a psychiatric core nurse who treated appellant at HCPC, testified for the State. Appellant stipulated to Dr. Samuels's qualifications as an expert in the field of psychiatry.

The probate court first heard testimony on the issue of commitment. Dr. Samuels, testified that he had the opportunity to observe appellant and appellant was cooperative. Dr. Samuels believed appellant understood the proceeding. He testified that appellant was diagnosed with bipolar disorder and agreed with the diagnosis. Dr. Samuels recognized that Dr. Kimm was operating under a diagnosis of psychotic disorder NOS, but stated appellant "has a standing diagnosis here of bipolar."

Dr. Samuels testified that in the past appellant benefitted from medications for the symptoms of bipolar disorder. He stated that when appellant "has taken the medicine episodically here, he has benefited also," and noted that appellant was offered several medications during his current stay, but was reluctant to take them.

Dr. Samuels testified appellant's behavior before his current treatment was "one of self-reported disorganization and hallucinations while essentially living at Wal-Mart." Although appellant had an apartment in the Galleria area, "he had really taken up residence in Wal-Mart." It was reported that appellant was using Walmart's wi-fi and facilities. Appellant felt he was being harassed by people and asked for help from security, which led to his being taken to NPC.

Dr. Samuels testified that he checks with the staff on a daily basis and the consistent feedback is, "quote, he is awful, he is terrible." Dr. Samuels explained:

He [appellant] has engaged in sexually provocative behavior, sexually aggressive behavior, towards females, female staff, racist behavior, very provocative behavior; a clear, consistent picture of agitation, irritation, provocative confrontation which is very consistent with the diagnosis of bipolar.

Dr. Samuels agreed that those types of behaviors are the basis of Dr. Kimm's opinion that appellant has very poor or no boundaries with regard to staff and patients. Dr. Samuels noted that appellant "has received intramuscular injections associated with a significant show of force by both female staff members, and the use of restraints on — roughly in every other day basis in this facility." Dr. Samuels further agreed that appellant's response to the intramuscular medications indicated "they are on the right track with medication."

Dr. Samuels' recommendation for appellant was to remain at that hospital under the care of Dr. Kimm and the treatment team, and further, if a commitment was granted, for appellant to receive a forced-medication hearing. Without further treatment and intervention, Dr. Samuels believed appellant would be likely to cause serious harm to himself or to others, either directly or indirectly as a result of his illness, "as demonstrated by the need for restraints and intramuscular medication. He believed that if appellant were released without intervention, appellant would suffer severe and abnormal mental, emotional, or physical distress; experience substantial mental or physical deterioration of his ability to function independently; would not be able to make the necessary decisions for daily living, (in particular, health and safety decisions); and would not be able to make a rational informed decision about whether to submit to outpatient care.

On cross-examination, Dr. Samuels testified that he was under the impression appellant was eating while at the hospital. Dr. Samuels was asked whether appellant was tending to his personal hygiene. He stated:

This is the neatest and cleanest he has looked. I've seen him on the unit where he has a towel wrapped around his waist and he's wearing his jeans outside of that. It looks a little bizarre, but there's nothing that looks like he's unable to take care of himself. I have not seen that.

Dr. Samuels testified that to his knowledge, appellant has not indicated having any thoughts of harming himself since he has been in the hospital. Appellant voluntarily took medications other than intramuscular injections. Appellant took Lithium on occasion, but stopped for approximately the three days before the hearing. Appellant took a medication that was not very helpful, and the staff wanted to change it, and appellant indicated that he wanted to take it, "but he wants to negotiate when to take it." Appellant wanted to take it at night because appellant said it made him sleepy. Dr. Samuels told appellant he "needs to follow the doctor's orders to take it when the doctor wishes for him to do that." Dr. Samuels observed appellant "at the nurse's station with the medicine, and there was a lot of bargaining and negotiating going on that was being reported." Dr. Samuels testified that "if you look at the overall picture from start to finish today, that he has taken some doses and he hasn't — if you just look at the total of all the doses, we would say it's slanted more heavily towards non-compliance."

Michael Helminiak testified that during the past weekend appellant required emergency intramuscular injections both days, because appellant was consistently testing limits, pushing boundaries with staff, not following staff attempts at redirection, and punching and kicking at the empty air in the day area. Further, Helminiak testified:

> I've also caught him a couple of times in the seclusion room where he was sleeping because he refused to sleep in the room with someone else. And he was self-talking and swinging a towel around in the air, brandishing it as a weapon like he was trying to strike something that wasn't there.

7

When we tried to get him to deescalate, he tried to bargain with medications, tried to put them off. And then when we told him he couldn't take them out of his scheduled times, he refused them outright.

He has a tendency to become antagonistic with the staff, making racially inappropriate remarks towards me specifically. He called me an idiot cowboy, white trash, a few other names. And becoming -- using a lot of profanity when he gets agitated and worked up as well.

He also threatened to get me fired a few times, claiming he had the ability to do that.

Helminiak stated that appellant intermittently participated in the groups or sessions offered to him and "sometimes has been inappropriate for it." Helminiak explained:

And you have to watch him when he's in these groups because of the sexually inappropriate behavior towards the females.

He will do things like try to inappropriately touch them in their midsections when they are walking by him.

Helminiak said that he would be concerned for appellant's safety and those around him if appellant were released without further treatment.

Appellant testified as an adverse witness. Appellant gave an address in the Galleria area as his residential address and said he had lived there a little more than one year. Appellant said he works as an engineer and obtained a general engineering degree. He testified he was relieved of his job in February—three months earlier. When asked how he was supporting himself, appellant said he had approximately $400 in the bank, and "also qualified for credit cards. I can get ID from the hospital."

According to appellant, the police brought him to the hospital because he asked a security guard at Walmart to call them. Appellant said he did not feel that he should "hang around there for too long" and "the staff there doesn't know how to do customer service well." He had been at the Walmart since approximately 10:00

or 11:00 p.m. Appellant denied telling the officer that he was hearing voices that told him to hurt himself.

When asked for a reason as to why he did not want to take his medication, appellant said, "I can take my medication when I get out of here when I see my primary care physician." Appellant could not remember the name of his doctor.

Appellant was asked what medication he ordinarily takes as an outpatient and said that he used to take Latuda 20. He then stated, "I didn't really discontinue it. I was just following dictation to different scam artists in Houston." When asked to explain his answer, appellant said he was living at the Victoria Park Apartments "unofficially as a guest." When asked if this was during the same time that he was paying rent at the Yorktown Apartments, appellant said, "I didn't pay rent. My rent was due on the first week." Appellant then said, "Yorktown Apartments kicked me out when I was sick. Somebody must have reported me there. That place is full of Indians, that's when we — they saw Indians." Appellant was asked if he still lived at the Yorktown Apartments and replied, "Well, I can go there and apply for living there." He then testified, "really what I plan to do is live at a hotel for a few days and call my dad . . .."

Appellant admitted to spending the night at the Wal-Mart. He stated his father is in Europe and the rest of his family is in Nepal. Appellant said his father knew he was in the hospital.

Appellant claimed to understand why people were worried about him and hoped that he would get back on his medication. He said, "I would like to. I don't mind — once I get out of here, I'm not taking medication and living here for free anymore." Appellant was asked for a reason for not working with the doctors and getting back on his medication, to get released sooner. He was asked if something

9

happened to make him distrustful of his physician, to which appellant responded, "No, he's okay." The following exchange then occurred:

Q. So once again, why won't you take the medication?

A. I can, once I get out of here. Or, well, I can take it tonight or tomorrow, but I need to get out of here today. I just can't handle this crazy hospital anymore.

Q. Do you realize that if you had begun working with the doctor and taking your medication when you first came in, that you would have been gone from here several days ago?

A. Yes, but I felt like it was something wrong, allegations like it was my fault. They were saying things that he believes is true, but it's not true. If they ask all the staff or any other people that said my fault, they might say something else, but that's my perception.

Q. So you think if we brought down someone else from the unit, they would have a different story?

A. No, I wouldn't really bring anybody else. Just stop it right here. If you want to bring them over, maybe they will, I don't --

Q. Do you understand that your -- do you understand that your behavior on the unit has been inappropriate?

A. Uh-huh.

Q. Then why do you do it? Why do you behave in that way if you know it's going to bring on seclusion and forced medication?

A. Well, for some questions, there's no answers because everything --

Q. Well, do you think it's possible that it's the illness that is making you behave this way?

A. No.

Appellant then testified on direct examination that he knew the hearing was to determine whether he would be involuntarily committed to a hospital. He also said that he understood that if the judge found he needed mental health treatment, the judge would sign an order committing him.

10

Appellant admitted that he had been in the same hospital in February. He also admitted that he no longer lives at the Yorktown Apartments. When asked where he would live if released, appellant again said he had $400 in a bank somewhere, and stated, "if I get an ID and bus pass, I can go straight to Galleria and fix everything up fast speed today." Appellant denied that he had not been taking his medication, saying, "I have taken every medication that was given to me, except Zyprexa. . . I don't like that one." Appellant said he had taken Latuda but did not recall how frequently, maybe two to four times.

Appellant indicated that he understood a forced medication hearing would be held immediately following any decision to commit him into the hospital. Appellant also understood that he probably would have been released sooner if he had taken his medication, "But the problem was on day one, somebody thought I was inappropriate with the ladies." When asked about the testimony that he was sexually inappropriate with women on the unit, he acknowledged it was inappropriate but said, "it was okayed with all the ladies."

Appellant denied having any thoughts of harming himself or anyone else. He also said he would be able to live on his own and take care of himself, including clothing himself, properly feeding himself, and taking care of his personal hygiene.

The probate court asked appellant about his chances of being hired since he had been in the hospital twice, first in February and now in May. Appellant said, "A hundred percent" and claimed to "now have enough connections that they don't even ask me any questions. I have following two job offers, 6, 7, 8, 9, 10 job offers."

The probate court signed a judgment finding appellant was mentally ill and as a result was likely to cause serious harm to himself, or likely to cause serious harm to others. The judgment further stated if not treated, that appellant will continue to suffer mental distress and deteriorate, and was unable to make a rational and

11

informed decision as to whether or not to submit to treatment. The probate court granted the State's application for court-ordered mental health services and committed appellant for a period of not more than forty-five days.

The probate court then heard testimony on the question of whether to order administration of psychoactive medication. Dr. Samuels reviewed the forced medication petition filed by Dr. Kimm. Dr. Samuels testified that Dr. Kimm indicated a diagnosis of bipolar one, manic with psychotic features, and agreed with that diagnosis. The recommendation was that appellant be treated with anti-depressants, anti-psychotics, anxiolytics and mood stabilizers, and would start with Zyprexa, an anti-psychotic medication. Dr. Samuels believed appellant lacked capacity to make a decision with regard to psychoactive medication.

Dr. Samuels testified that treatment could be limited if appellant responded positively. He testified appellant's prognosis would be poor without the medication. When the State asked Dr. Samuels if he was aware of any alternatives that would be less invasive but equally effective, he replied "I am not," then added, "And his current course of hospitalizations does not give us any alternative."

Appellant then testified. According to appellant, he refused to take the prescribed medication because "[t]hey're not giving the right medications." Appellant said he did not want "forced medication. . . That's demeaning."

The probate court granted the petition to administer psychoactive medication.

On May 11, 2018, appellant filed this appeal and on May 18, 2018, he was discharged. According to Dr. Kimm, appellant was discharged to outpatient voluntary services because he no longer met the criteria for court-ordered in-patient mental health services.

## BURDEN OF PROOF

### *Order for Temporary Civil Commitment*

The trial court may order a mentally ill patient to receive court-ordered temporary inpatient mental health services only if the State proves by clear and convincing evidence the following:

(1) the proposed patient is mentally ill; and

(2) as a result of that mental illness the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; or

(C) is:

> (i) suffering severe and abnormal mental, emotional, or physical distress;

> (ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

> (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

Tex. Health & Safety Code § 574.034(a). A trial court must specify the criteria forming the basis for its decision to grant the State's application. *Id*. § 574.034(c).

To constitute clear and convincing evidence under § 574.034(a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function. *Id.* § 574.034(d).

*Order to Administer Psychoactive Medication*

The trial court may order the administration of one or more classes of psychoactive medication to a patient who is under a court order to receive inpatient mental health services under certain circumstances. Tex. Health & Safety Code § 574.106. As applicable to this case, those circumstances exist only if the State proved by clear and convincing evidence that the patient lacked the capacity to make a decision regarding the administration of the proposed medication, and treatment with the proposed medication was in the patient's best interest. Tex. Health & Safety Code § 574.106 (a-1)(1). In making the best-interest finding, the court shall consider:

(1) the patient's expressed preferences regarding treatment with psychoactive medication;

(2) the patient's religious beliefs;

(3) the risks and benefits, from the perspective of the patient, of taking psychoactive medication;

(4) the consequences to the patient if the psychoactive medication is not administered;

(5) the prognosis for the patient if the patient is treated with psychoactive medication;

(6) alternative, less intrusive treatments that are likely to produce the same results as treatment with psychoactive medication; and

(7) less intrusive treatments likely to secure the patient's agreement to take the psychoactive medication.

Tex. Health & Safety Code § 574.106(b).

## STANDARD OF REVIEW

Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam)).

14

In a legal sufficiency review, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so and should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id.*

In a factual sufficiency review, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the State's allegations are true. *Id.* We should consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient." *Id.*

### ANALYSIS

Appellant does not challenge the probate court's finding that he is mentally ill. *See* Tex. Health & Safety Code § 574.034(a)(1). Appellant argues the evidence does not support the probate court's finding that he was likely to cause serious harm to himself. *See id.* § 574.034(a)(2). Specifically, appellant makes two complaints. First, appellant contends Dr. Samuels failed to support his conclusions with facts, thus, according to appellant, the requisite expert testimony is lacking. *See id.* § 574.034(d). Second, appellant asserts the evidence does not show an overt act or

continuing pattern of behavior that tends to confirm the likelihood of distress and the deterioration of appellant's ability to function. *See id.* § 574.034(d)(2).

*Order for Temporary Civil Commitment*

The judgment reflects the probate court specified the basis for its decision was its finding that appellant was likely to cause serious harm to himself or a likelihood of causing serious harm to others. *See* Tex. Health & Safety Code §§ 574.034(a), (c). The probate court heard evidence that appellant was hearing voices telling him to hurt himself. *After* he was hospitalized and medicated, there was no further evidence that appellant was hearing those voices.

Appellant denied that he told the guard at Walmart that he was hearing voices telling him to hurt himself. However, the probate court, as the factfinder, was not required to believe that testimony. *See House v. State*, 261 S.W.3d 244, 254 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (stating that trial court, as factfinder and sole judge of the credibility of the witnesses, was within its discretion in finding the expert's testimony in support of extending appellant's involuntary inpatient mental health treatment was more credible than that of two experts who testified in favor of appellant's release).

An overt act includes verbal statements. *See K.E.W.*, 315 S.W.3d at 22. "[W]hen the words expressed by a person that has a mental illness foreshadows violence, the Legislature has permitted the law's intervention to prevent serious injury. . ." *Id.* As the *K.E.W.* court explained, "[t]he statute does not require evidence of a recent overt act that by itself proves the likelihood a proposed patient will cause serious harm to others. *Id.* at 23 (citing Tex. Health & Safety Code § 574.034(d)). Rather, the statute only requires the overt act "tends to confirm" the likelihood of serious harm. *Id*. A recent overt act "tends to confirm" the patient poses a likelihood of serious harm to himself, within the meaning of Section 573.034(d), "if the overt

act is to some degree probative of a finding that serious harm is probable, even though the overt act itself may not be dangerous." *Id.* Thus "the statute requires evidence of a recent act by the proposed patient, either physical or verbal, that can be objectively perceived and that to some degree is probative of a finding that serious harm to [himself] is probable if the person is not treated. The overt act itself need not be of such character that it alone would support a finding of probable serious harm to [the proposed patient]. *See* Tex. Health & Safety Code § 573.034(d)(1)." *Id.* at 24.

In addition to the statements appellant made, both Dr. Samuels and Helminiak testified that if appellant were released without intervention, he would pose a danger to himself. Both supported their testimony with facts concerning the necessity of intramuscular injections, appellant's refusal to voluntarily take his medication, appellant's negotiations with staff regarding taking his medication and the timing of taking his medications, and appellants irrational behavior and actions at the hospital when he was not taking his medications. Dr. Samuels testified that "if you look at the overall picture from start to finish today, that he has taken some doses and he hasn't — if you just look at the total of all the doses, we would say it's slanted more heavily towards non-compliance." Thus the conclusions of Dr. Samuels and Helminiak were supported by facts.

The testimony of appellant's treating medical care providers was uncontroverted in regard to the distress and deterioration appellant would suffer if he did not receive his medication and treatment. Dr. Kimm opined that if the recommended psychoactive medications were not administered, the consequences to appellant would be a further decline in his ability to function. Dr. Samuels testified if appellant were released without intervention, appellant would suffer severe and abnormal mental, emotional, or physical distress; experience substantial mental or

17

physical deterioration of his ability to function independently; would not be able to make the necessary decisions for daily living, (in particular, health and safety decisions); and would not be able to make a rational informed decision about whether to submit to outpatient care. Thus there was evidence of a requisite overt act and/or continuing pattern of behavior that tended to confirm appellant's distress and the deterioration of his ability to function.

Considering all the evidence in the light most favorable to the probate court's finding, we determine a reasonable trier of fact could have formed a firm belief or conviction that appellant was likely to cause serious harm to himself. *See In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we conclude the evidence is legally sufficient to support the probate court's order.

Further, giving due consideration to evidence the probate court could reasonably have found to be clear and convincing, we determine the evidence is such that a factfinder could reasonably form a firm belief or conviction the State's allegation that appellant was likely to cause serious harm to himself was true. *Id.* The disputed evidence as to whether appellant heard voices telling him to hurt himself is not so significant that the probate court could not reasonably have formed a firm belief or conviction that the State's allegation was true. *Id.* Accordingly, we conclude the evidence is factually sufficient to support the probate court's order.

*Order to Administer Psychoactive Medication*

Appellant contends the probate court erred in ordering the administration of psychoactive medication because there was legally and factually insufficient evidence to support the commitment order. *See* Tex. Health & Safety Code §§ 574.034, 574.106. As noted above, in this case the State was required to prove by clear and convincing evidence that appellant lacked the capacity to make a decision regarding the administration of the proposed medication, and treatment with the

18

proposed medication was in his best interest. *See* Tex. Health & Safety Code § 574.106 (a-1)(1). Appellant refers to section 574.106(b)(1), which states the court shall consider "the patient's expressed preferences regarding treatment with psychoactive medication." Appellant did express his preference that the probate court deny the petition. *See* Tex. Health & Safety Code § 574.106(b)(3)-(6). However, as set forth above, there are other factors a court "shall consider." Dr. Samuels testified regarding these factors. His testimony was not disputed, no contrary evidence was presented, and appellant makes no argument that these factors did not weigh in favor of granting the petition.

Considering all the evidence in the light most favorable to the probate court's finding, we determine a reasonable trier of fact could have formed a firm belief or conviction that appellant lacked the capacity to make a decision regarding the administration of the proposed medication, and treatment with the proposed medication was in his best interest. *See In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we conclude the evidence is legally sufficient to support the probate court's order.

Giving due consideration to evidence the probate court could reasonably have found to be clear and convincing, we determine the evidence is such that a factfinder could reasonably have formed a firm belief or conviction that the State's allegations are true. *Id.* There being no disputed evidence as to factors (b)(3) through (b)(6), we conclude the contrary evidence as to factor (b)(1) is not so significant that the probate court could not reasonably have formed a firm belief or conviction that the State's allegations are true. *Id.* Accordingly, we conclude the evidence is factually sufficient to support the probate court's order.

In addition, having found the evidence is both legally and factually sufficient to support the commitment order, there is no basis for appellant's contention the

probate court erred as to the medication order for lack of a valid order for temporary mental health services.

## CONCLUSION

Appellant's issue is overruled. The probate court's judgment of commitment for temporary inpatient mental health services and order to administer psychoactive medication are affirmed.

/s/　Margaret "Meg" Poissant
　　　Justice

Panel consists of Justices Wise, Jewell and Poissant.